EAST BATON ROUGE PARISH C-778932
Filed May 27, 2026 2:20 PM 27
Deputy Clerk of Court

| | |
|---|---|
| **J.O.** | **DOCKET: DIVISION:** |
| **VERSUS** | **19TH JUDICIAL DISTRICT COURT** |
| **KEYANA NASH, *Individually*, AND STATE OF LOUISIANA, through the OFFICE OF JUVENILE JUSTICE** | **PARISH OF EAST BATON ROUGE** |
| | **STATE OF LOUISIANA** |

**PETITION FOR DAMAGES**
**UNDER AND 42 USC 1983 AND LA C.C. ART. 2315**

The Petition of J.O., citizen of the age of majority of the State of Louisiana, and resident of East Baton Rouge Parish, respectfully represents that **made defendants herein are:**

1.

a) **Keyana Nash,** who, based on knowledge, information, and belief, was at all times relevant to this complaint employed as a juvenile justice specialist for the Office of Juvenile Justice, State of Louisiana, and acting in course and scope of that employment and under the color of state law. She is sued in her individual capacity.

b) The **State of Louisiana, Office of Juvenile Justice:** employer of Nash; is sued for state law delicts of the above-named officer under the theory of vicarious liability as all delicts caused by Nash were in the course and scope of her employment with the State of Louisiana.

2.

The above-named defendants are responsible and liable, in solido, to petitioners due to the following:

3.

This action arises under Louisiana Civil Code Article 2315, liability for acts causing damages, namely, sexual battery, sexual assault, and intentional infliction of emotional distress, her employer, the State of Louisiana, through respondeat superior, and under 42 USC 1983, a civil rights claim against Keyana Nash, individually.

**FACTUAL ALLEGATIONS**

4.

J.O. was a juvenile offender when he was incarcerated at Acadiana Center for Youth, Bunkie LA, between March 2024 and July 2025. He just turned 18 when sexual misconduct began.

CERTIFIED TRUE AND CORRECT COPY
JUL 29 2026
East Baton Rouge Parish
Deputy Clerk of Court

5.

During that period, Keyana Nash worked as a juvenile justice specialist at Acadiana Center for Youth at Bunkie, the same facility in which J.O. was incarcerated.

6.

On or about February of 2025, Keyana Nash took a sexual interest in J.O. Keyana Nash and J.O. would communicate both in person during her shifts and via prison telephone when she was not working.

7.

On information and belief, between February 2025 and May of 2025, Keyana Nash had sexual intercourse with J.O. a total of five times. These sexual acts took place in an area known as "the cut," which was allegedly located in the "bulldog" dorm of the Acadiana Center for Youth.

8.

Additionally, Keyana Nash would regularly force Plaintiff to sit next to, grope, and sexually pleasure her in both the "day area" and the bathroom of the Acadiana Center for Youth.

9.

Nash schemed to keep J.O. at the Acadiana Center for Youth so she could continue her abuse. She accomplished this by repeatedly "writing" J.O. up. J.O. told the Honorable Juvenile Court Judge of the repeated write-ups during a closed Juvenile Court hearing.[1]

10.

During this scheme, Keyana Nash tormented J.O., telling him, "You're not going home if you don't come in the cut and have sex." Further, Keyana Nash would mace[2] and beat up J.O. and other incarcerated juveniles.[3]

11.

J.O. called the PREA hotline at the facility repeatedly in May, but to no avail. On information and belief, the Acadiana Center for Youth subsequently removed the PREA informational signs, in violation of PREA.

12.

J.O. told his youth counselor, Deveral LaFountain, of sexual abuse by Keyana Nash.[4]

---

[1] Exhibit A – May 29, 2025 Juvenile Court Transcript 4:5-17.
[2] Exhibit A – May 29, 2025 Juvenile Court Transcript 4:20-24.
[3] Exhibit A – May 29, 2025 Juvenile Court Transcript 8:4-5.
[4] Exhibit A – May 29, 2025 Juvenile Court Transcript 7:18-26.

13.

J.O. and his mother informed the Honorable Judge Adam Haney of the East Baton Rouge Juvenile Court of the acts of sexual abuse that transpired in court in a hearing on an unrelated matter.[5] At this hearing, Counselor LaFountain also confirmed her knowledge of these acts.[6]

## MANDATORY REPORTING

14.

Section 115.61 of PREA,[7] staff and agency reporting duties, details that "all employees and contract staff have an affirmative duty to report sexual abuse. This includes medical and mental health practitioners, specifically including practitioners who work directly for the agency or facility, and practitioners who work pursuant to a contractual agreement with the agency or facility," are required to report instances of sexual abuse.

15.

Further, the pertinent definition of "mandatory reporter," is defined in Louisiana Children's Code Art. 603(17)(o).

> Art. 603(17) "Mandatory reporter" is any of the following individuals:
>
> (o) **Any employee** of the office of Juvenile Justice or the Department of Children and Family Services, whose duties include supervisory or disciplinary authority over children.

16.

Indeed, these standards make Ms. LaFountain a mandatory reporter.

## LOUISIANA LAW PROHIBITS GUARDS FROM HAVING SEX WITH INMATES

17.

Juvenile Justice Specialist Keyana Nash was arrested and charged with malfeasance in office – sexual conduct, pursuant to La. R.S. 14:134.1 in May of 2025.




[5] Exhibit A – May 29, 2025 Juvenile Court Transcript 5:18-32.
[6] Exhibit A – May 29, 2025 Juvenile Court Transcript 7:18-26.
[7] Exhibit B – PREA Staff and agency reporting duties §115.61

18.

Louisiana law prohibits guards from having sex with inmates. LRS 14:134.1 reads as follows:

> A. It shall be unlawful and constitute malfeasance in office for any of the following persons to engage in sexual intercourse or any other sexual conduct with a person who is under their supervision and who is confined in a prison, jail, work release facility, or correctional institution, or under the supervision of the division of probation and parole, or who is detained or arrested:
> (1) A law enforcement officer.
> (2) An officer, employee, contract worker, or volunteer of the Department of Public Safety and Corrections or any prison, jail, work release facility, or correctional institution.
> B. Whoever violates a provision of this Section shall be fined not more than ten thousand dollars or imprisoned at hard labor for not more than ten years, or both.
> C. For purposes of this Section, "law enforcement officer" shall include commissioned police officers, sheriffs, deputy sheriffs, marshals, deputy marshals, correctional officers, constables, wildlife enforcement agents, state park wardens, and probation and parole officers.

19.

Defendant Keyana Nash is considered a "guard" under LRS 14:134.1.

20.

The Supreme Court has stated that rape in prison violates the Constitution.

> Rape or other violence among prison inmates serves absolutely no penological purpose. See *Rhodes v. Chapman*, 452 U.S. 337, 345-346, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981), citing *Gregg v. Georgia*, 428 U.S. 153, 183, 49 L. Ed. 2d 859, 96 S. Ct. [**1987] 2909 (1976) (joint opinion) (the Eighth Amendment prohibits all punishment, physical and mental, which is "totally without penological justification"). "Such brutality is the equivalent of torture and is offensive to any modern standard of human dignity." 444 U.S. 394, 423, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980) (BLACKMUN, J., dissenting). The horrors experienced by many young inmates, particularly those who, like petitioner, are convicted of nonviolent offenses, border on the unimaginable. Prison rape not only threatens the lives of those who fall prey to their aggressors but is potentially devastating to the human spirit. Shame, depression, and a shattering loss of self-esteem accompany the perpetual terror the victim thereafter must endure. See Note, Rape in Prison and AIDS: A Challenge for the Eighth Amendment Framework of *Wilson v. Seiter*, 44 Stan. L. Rev. 1541, 1545 (1992).

21.

Said best, "Guards have virtually absolute authority within prisons .... This imbalance of power between guards and inmates allows guards to take advantage of a prisoner's dependency on them for basic necessities by giving guards the opportunity to withhold privileges."[8]

22.

---

[8] *See* Anthea Dinos, Custodial Sexual Abuse: Enforcing Long Awaited Policies Designed to Protect Female Prisoners, 45 N.Y.L. SCH. L. REV. 281 (2000) note 49, at 282

This imbalance of power allowed Defendant Keyana Nash to coerce and force J.O. to perform sexual acts.

23.

On information and belief, J.O. documented the incidents of sexual abuse in his journal. This journal was seized by Avoyelles Parish Sheriff's office during the investigation.

**THE PRISON RAPE ELIMINATION ACT ("PREA")**

24.

The State of Louisiana's Department of Public Safety and Corrections, Corrections Services Department's regulation No. C-01-022,[9] details the general field operations and definitions under PREA.

25.

In Section AA of regulation No. C-01-022, - Sexual Abuse (§115.6)(2),[10] "sexual abuse" is defined as:

> 2) Sexual abuse of an offender by a staff member, contractor or volunteer which includes any of the following acts, with or without the consent of the offender:
>
> a. Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
> b. Contact between the mouth and the penis, vulva, or anus;
> c. Contact between the mouth and any body part where the staff member, contractor or volunteer has the intent to abuse, arouse or gratify sexual desire;
> d. Penetration of the anal or genital opening, however slight, by a hand, finger, object or other instrument that is unrelated to official duties or where the staff member, contractor or volunteer has the intent to abuse, arouse, or gratify sexual desire;
> e. Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh or the buttocks that is unrelated to official duties or where the staff member, contractor or volunteer has the intent to abuse, arouse, or gratify sexual desire;
> f. Any attempt, threat, or request by a staff member, contractor or volunteer to engage in the activities described in Subsections 2)a. through e. of this Section;
> g. Any display by a staff member, contractor or volunteer of their uncovered genitalia, buttocks or breast in the presence of an offender; and
> h. Voyeurism by a staff member, contractor or volunteer.

26.

Defendant Keyana Nash's acts are the exact acts PREA sought to prevent. The imbalance of power prohibits any offender, much less a youthful offender, to consent to sexual acts while incarcerated.

27.

[9] Exhibit C – Louisiana DPSC department regulation No. C-01-022
[10] Exhibit C – Louisiana DPSC department regulation No. C-01-022 pp. 5-6

The acts of sexual abuse are not isolated acts. The week prior to Defendant Keyana Nash's arrest, another Juvenile Justice Specialist, Khy Winbush, was also arrested for malfeasance in office, sexual conduct. In August, another Juvenile Justice Specialist, Regina Holmes, was arrested for the same offense with another incarcerated youth.

28.

On information and belief, these guards had created a culture of rape and exploitation at the Acadiana Center for Youth, which should shock the conscience of the state. While these boys committed acts that required them to serve prison time, rape was certainly not part of the sentence.

**CIVIL RIGHTS VIOLATION**

29.

**CAUSE OF ACTION 1:**
**42 USC 1983: VIOLATION OF EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT: CRUEL AND UNUSUAL PUNISHMENT AGAINST JUVENILE JUSTICE SPECIALIST KEYANA NASH, INDIVIDUALLY**

30.

The plaintiff incorporates all the facts pleaded *supra*. A prisoner cannot legally consent to sex with his guard. Juvenile Justice Specialist Keyana Nash committed rape five times and sexually battered and assaulted J.O. numerous other times. This is in violation of the Fourteenth and Eighth Amendment to the United States Constitution, prohibiting cruel or unusual punishments to detainees.

31.

The Middle District of Louisiana addressed the Eighth Amendment right of prisoners to be free from sexual abuse in *Johnson v. Holliday*, 2017 U.S. Dist. LEXIS 238021 (M.D. La. Feb. 15, 2017), providing:

> "[i]n the simplest and most absolute of terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault, and no reasonable prison guard could possibly have believed otherwise." *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (finding that defendant guard was not entitled to qualified immunity for attempting to rape a female transsexual prisoner); *see also Ashley v. Perry*, No. 13-354, 2015 WL 9008501, at *2 (M.D. La. Dec. 15, 2015) ("The United States Court of Appeals for the Fifth Circuit has instructed that 'sexual assaults against inmates by prison guards without lasting physical injury may be actionable under the Eighth Amendment as acts which are offensive to human dignity.' "(citing *Copeland v. Nunan*, 250 F.3d 743 (5th Cir. 2001) (unpublished but persuasive) (internal quotations omitted)); *Carrigan v. Davis*, 70 F. Supp. 2d 448 (D. Del. 2011) (holding that fellatio between an inmate and a guard is a per se violation of the Eighth Amendment and that inmates cannot, as a matter of law, consent to sex with a guard); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("there can

be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation.").

32.

As a result of these rapes, the plaintiff suffered and continues to suffer mental and psychological damages and requests compensatory damages as proved at trial.

33.

Under 42 U.S.C. § 1988, plaintiff demands reasonable attorney's fees and interest on attorney's fees.

34.

Plaintiff demands exemplary damages against Defendant Nash for her conduct with malice, recklessness, and/or callous indifference to the federally protected rights of J.O.

**CAUSE OF ACTION 2:**
**SEXUAL ASSAULT AND BATTERY UNDER STATE LAW, LA CC ART. 2315 AGAINST KEYANA NASH, AND VICARIOUS LIABILITY OF THE STATE OF LOUISIANA, THROUGH THE ACADIANA CENTER FOR YOUTH AND LOUISIANA OFFICE OF JUVENILE JUSTICE**

35.

The plaintiff incorporates all facts pleaded *supra*. Defendant Keyana Nash sexually battered J.O. on numerous occasions by coercing and forcing him to have sex with her, as well as coercing and forcing him to sexually pleasure her by rubbing and touching her.

36.

The State of Louisiana, through the Acadiana Center for Youth and the Louisiana Office of Juvenile Justice, as employers of Keyana Nash, are both vicariously liable for the state law delicts of its servants committed while on duty at the jail under the theory of *respondeat superior*.

37.

Under Louisiana law, an employer may be held vicariously liable for the intentional torts of its employees committed in the exercise of the functions in which they are employed. In *Latullas v. State*, 94-2049 (La. App. 1 Cir. 6/23/95), 658 So. 2d 800, 804, the First Circuit held the State vicariously liable for a correctional officer's rape of a prisoner, reasoning that the officer was able to separate the victim from fellow inmates because of the authority bestowed upon him by his employer, and that the rape occurred while the officer was at least partly actuated by his purpose of acting for his employer in the control

and supervision of inmates. Here, as in *Latullas*, Defendant Nash's sexual abuse of J.O. was made possible solely by the authority and access conferred upon her through her position as a Juvenile Justice Specialist. The abuse occurred on the employer's premises, during her working hours, and it was through her supervisory duties over J.O. that the opportunity to commit these acts arose.

**CAUSE OF ACTION 3:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

38.

Defendant Nash, acting under color of law and within the scope of her agency, recklessly and with the intention of causing J.O. severe emotional distress, engaged in extreme and outrageous conduct by committing sexual assault and battery of J.O., including third degree rape, as it is intercourse without legal consent of the victim, who was incarcerated at a youth correctional facility.

39.

As a direct and proximate result of Defendant's acts, which were so outrageous in character and extreme in degree as to be utterly intolerable in a civilized community, J.O. suffered severe emotional distress and mental anguish.

40.

The State of Louisiana, through the Acadiana Center for Youth and the Louisiana Office of Juvenile Justice, as employers of Keyana Nash, are additionally both vicariously liable for the state law delicts of its servants committed while on duty at the jail under the theory of *respondeat superior.*

**CAUSE OF ACTION 4: NEGLIGENCE OF THE STATE OF LOUISIANA**

41.

Defendant Nash's sex crimes against Plaintiff are not isolated events. On May 9, 2025, police arrested another Guard named Khy Winbush for having sex with juvenile inmates at the Acadiana Center for Youth in Bunkie.

42.

On August 13, 2025, another guard at the Acadiana Center for Youth, Regina Holmes, was arrested for criminal sexual acts with an inmate.

43.

The decision-making leaders at the Acadiana Center for Youth, Office of Juvenile Justice, allowed these guards free rein to control these young teenagers and manipulate them for their sexual desires. Any supervisor would know or should know of the rampant sex crimes occurring on his watch by the guards because these sex acts could not occur unless the supervisors either knew of them or were completely incompetent. This deliberate indifference to the safety of the inmates constitutes an illegal custom or policy and the State of Louisiana bears liability for failing to protect J.O. and other inmates in its care at the Acadiana Center for Youth.

44.

J.O is no longer incarcerated, therefore, the PLRA's exhaustion requirements do not apply. *Bargher v. White*, 928 F.3d 439, 441 (5th Cir. 2019).

45.

Nash's employer, the State of Louisiana, Louisiana Office of Juvenile Justice, is domiciled in East Baton Rouge Parish. Accordingly, under RS 13:5104, venue is proper.

46.

Damages will exceed $10,000. Plaintiff demands trial by jury.

WHEREFORE, Plaintiff prays that a copy of this pleading be served upon the Defendants, that it be cited to answer, and after all due proceedings, a judgment be entered in favor of Plaintiff and against Defendants, *in solido*, awarding damages as proved, punitive damages, court costs, judicial interest from date of judicial demand, attorney's fees, interest on attorney's fees, and any other relief Equity and Justice require.

Respectfully Submitted,

*/s/Joseph J. Long*
Joseph J. Long (LA Bar Roll #25968)
Ryan T. Hau (LA Bar Roll #41776)
251 Florida Street, Suite 308
Baton Rouge, Louisiana 70801
(225) 343-7288 (telephone)
JOE@LEGAL225.COM
RYAN@LEGAL225.COM

**Please Serve Defendants:**

**Keyana Nash**
1514 Weems Ave.
Lecompte, LA 71346

**State of Louisiana Office of Juvenile Justice**
7919 Independence Blvd.
Baton Rouge, LA 70806

CERTIFIED TRUE AND CORRECT COPY
JUL 2 9 2026
East Baton Rouge Parish
Deputy Clerk of Court

EAST BATON ROUGE PARISH C-778932
Filed May 27, 2026 2:20 PM 27
Deputy Clerk of Court

JUVENILE COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DIVISION A

ORIGINAL

. . . . . . . . . . . . . . . . . . . . .

STATE OF LOUISIANA

IN THE INTEREST OF PET#: 117274, 117757, 119710

J[redacted] 2019 JU 00250

. . . . . . . . . . . . . . . . . . . . .

DISPOSITION REVIEW HEARING

THURSDAY, MAY 29, 2025

THE HONORABLE ADAM J. HANEY, JUDGE PRESIDING

APPEARANCES:

REPRESENTING THE FOLLOWING:

ALISA PLAISANCE, ESQ.
ASSISTANT DISTRICT ATTORNEY, COUNSEL ON BEHALF OF THE STATE OF LOUISIANA

JAMES ROTHKAMM, ESQ.
COUNSEL ON BEHALF OF MINOR CHILD J.D. O[redacted]

SHAWANDA ROBINSON, PROBATION OFFICER

DEVERAL LAFOUNTAIN, COUNSELOR

[redacted] SCOTT, MOTHER OF THE MINOR CHILD

FILED
JAN 2 0 2025
DEPUTY CLERK OF COURT

TRANSCRIBED BY:

SHONDA D. JONES, BA, MPA, CCR
CERTIFIED COURT REPORTER
IN AND FOR THE PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

EXHIBIT A

# I N D E X

| | PAGE NO. |
|---|---|
| DISPOSITIONAL REVIEW HEARING | |
| BY MR. ROTHKAMM ------------------------------ | 8 |
| BY MS. PLAISANCE ----------------------------- | 10 |
| DISPOSITION OF THE COURT --------------------------- | 11 |
| REPORTER'S PAGE ------------------------------------ | 18 |
| CERTIFICATE PAGE ----------------------------------- | 19 |

NO EXHIBITS

THURSDAY, MAY 29, 2025

THE COURT: ALL RIGHT. NAME, ADDRESS, AND DATE OF BIRTH, PLEASE?

THE MINOR: J[redacted] O[redacted]; [redacted] (INAUDIBLE) DRIVE.

MS. GARDNER: CARRIE GARDNER, [redacted], MS. [redacted] SCOTT.

THE COURT: THANK YOU.

MR. ROTHKAMM: JAMES ROTHKAMM, ON BEHALF OF MR. O[redacted].

THE COURT: ALL RIGHT. LET'S SEE. ALL RIGHT. ALL RIGHT. MS. LAFOUNTAIN.

MS. LAFOUNTAIN: YES.

THE COURT: I ALWAYS WANT TO CALL YOU LA FOUNTAINE, BUT I THINK IT'S LAFOUNTAIN; RIGHT?

MS. PLAISANCE: JUDGE, I THINK IT'S JUST LAFOUNTAIN. LAFOUNTAIN.

THE COURT: LAFOUNTAIN. OKAY. WELL, GOOD. ALL RIGHT. THEN I HAD IT -- I HAD IT RIGHT THE FIRST TIME.

MS. PLAISANCE: CORRECT.

THE COURT: HOW ARE YOU DOING, MA'AM. YOU'RE MUTED, WE CAN'T HEAR YOU.

MS. LAFOUNTAIN: I'M ALL RIGHT, AND YOU?

THE COURT: I'M GOOD. I'M GOOD. HOW IS JOSEPH DOING?

MS. LAFOUNTAIN: HE HAS BEEN DOING MUCH, MUCH BETTER.

THE COURT: OKAY.

MS. LAFOUNTAIN: HE WAS PLACED ON A BEHAVIOR PLAN ON MAY 2ND, AND HE HAS NOT RECEIVED A WRITE-UP SINCE THEN, SO JOSEPH IS 27 DAYS CLEAN OF CODE OF CONDUCTS.

**THE COURT:** THAT'S GOOD.

**MS. LAFOUNTAIN:** HE'S -- YEAH.

**THE COURT:** WHY -- WHY WE HAVE TO GET TO THIS POINT?

**THE MINOR:** THAT WAS, LIKE, WITH THE STAFF, LIKE, IT WAS THE STAFF AND SHE WAS -- SHE WAS TRYING TO MESS WITH ME, LIKE. AND THEN SHE, LIKE, I AIN'T WANT TO MESS WITH HER, SHE GOT TO WRITING ME UP. SO, WHEN I SEEN SOMETHING WROTE UP, AND THAT'S WHEN SHE GOT TO WRITING ME UP BACK AND FORTH. THEN AFTER SHE GOT FIRED, THEY SENT HER TO JAIL AND EVERYTHING --

**THE COURT:** WELL, I'M GOING TO LOOK AT SOME OF THESE WRITE-UPS. NOT ALL THE SAME PERSON.

**THE MINOR:** YEAH, IT'S LIKE, SOME OF HER FRIENDS, LIKE -- SOME OF THER FRIENDS, LIKE -- SOME OF HER FRIENDS WORK THERE TOO, THEY WAS, LIKE, COMING FROM TO THE -- AND, LIKE, WHEN THEY MACED US, LIKE, SHE --

**MS. ROBINSON:** AND I ALSO HEARD THESE THINGS, JUDGE.

**THE MINOR:** -- SHE'LL GET US IN TROUBLE, LIKE, THEY'LL MACE US, AND THEY'LL BUY -- THEY'LL HAVE THEIR OWN MACE. LIKE, THEY'LL BUY THEIR OWN MACE AND MACE YOU, SO WHEN THEY WEIGH THEIR CAN OF MACE, THEY DON'T -- IT WEIGH THE SAME, LIKE, THEY AIN'T DID NOTHING.

**THE COURT:** SO, YOU'RE ON THE SAME DORM?

**THE MINOR:** YES, SIR. LIKE, THEY HAD MOVED HER. THEY MOVED THEM, BUT ALL THEY DID WAS PUT -- PUT CAMERAS IN THE DORM, STUFF LIKE THAT, BUT SHE STILL LIKE -- ALL THE HOMEGIRLS, YOU KNOW, THEY STILL COME TO THE DORM.

**THE COURT:** SO, LET ME -- LET ME ASK YOU THIS, BECAUSE I'M NOT SAYING YOU'RE WRONG; RIGHT. WHY DON'T

-- WHY -- WHAT'S THE DEAL? WHY YOU THINK THIS IS GOING ON? WHY IS IT GOING ON?

**THE MINOR:** CAUSE, LIKE, WE -- AND THE FACT WE WAS SUPPOSED TO HAVE -- LIKE, WE WAS -- SHE WAS -- SHE WAS -- WE WAS SUPPOSED TO HAVE, LIKE, A ALTERCATION, BUT I AIN'T -- I AIN'T -- I WOULDN'T MESS -- I WASN'T MESSING WITH HER, THEN --

**THE COURT:** (INAUDIBLE).

**MS. SCOTT:** TELL HIM -- TELL HIM --

**THE MINOR:** DO WHAT -- HOLD ON. ALL RIGHT, LOOK --

**MS. SCOTT:** YOU CAN PUT IT ON THE TABLE WHAT SHE WAS DOING.

**THE MINOR:** ALL RIGHT. WE WAS MESSING WITH EACH OTHER. IT WAS LIKE THIS; WE WAS GOING WITH EACH OTHER AND STUFF.

**THE COURT:** WHAT YOU MEAN?

**MS. SCOTT:** THE STAFF WAS HAVING THE CHILDREN.

**THE MINOR:** LIKE, WE WAS GOING TOGETHER. LIKE, ME AND HER WAS GOING TOGETHER WITH EACH OTHER, THEN I STOPPED MESSING WITH HER LIKE THAT. WE STOPPED MESSING WITH EACH OTHER, THAT'S WHEN SHE GOT TO WRITING ME UP, GETTING HER FRIENDS TO WRITE ME UP, STUFF LIKE THAT. THEN I WROTE HER UP, SO ALL THEY DID WAS MOVED HER, AND SHE WAS IN THE BATHROOM WITH ME, THEY MOVED HER AFTER THAT.

THEN SHE GOT TO MESSING WITH ANOTHER YOUTH. HE WROTE HER UP, GOT HER (INAUDIBLE). THEY SEEN THAT SHE WAS MESSING WITH YOUTHS, AND THAT'S WHEN THEY -- THEY DID A CAMERA REVIEW, SEEN SHE WAS IN A BATHROOM WITH A YOUTH OVER 20 MINUTES, YOU KNOW WHAT I'M SAYING, SHE GOT FIRED.

**THE COURT:** WAS THAT THE ONE -- IS SHE THE -- IS SHE THE ONE THAT GOT CHARGED AT ACY, CAUSE I SAW THAT IN THE PAPER? IS THAT RIGHT?

**MS. LAFOUNTAIN:** YEAH, WE HAD TWO FROM THIS YEAR.

**THE COURT:** SO, ALL RIGHT. SO, AT THIS POINT, IF WHAT HE'S TELLING ME IS -- IS EVEN CLOSE TO ACCURATE, LIKE, ALL OF THESE -- THESE OLD WRITE-UPS SHOULD KIND OF GO AWAY, HUH?

**MS. LAFOUNTAIN:** YEAH, WHICH IS -- LIKE, WHEN I GOT IT, THEY ARE EXPIRED. MOST OF THEM ARE EXPIRED, EXCEPT THAT CONTRABAND, YOU KNOW, THEY LAST 90 DAYS, BUT THIS WAS THE REASON THAT HE HAD SO MANY, WHEN HE GET A (INAUDIBLE) STAFFING, TALKED TO PROBATION AND PAROLE, PUT HIM ON A BEHAVIORAL PLAN, AND HE'S BEEN FOLLOWING THAT BEHAVIOR PLAN REALLY WELL.

**THE COURT:** WELL, I HOPE -- WELL, MY QUESTION IS THIS, IT'S LIKE -- IT'S -- THE OFFICER HE'S TALKING ABOUT, CAUSE I DO SEE HER NAME POP UP HERE A BUNCH OF TIMES, IS THE ONE THAT GOT -- IS THE ONE THAT GOT FIRED? SO, I MEAN, THIS IS -- IT'S REASONABLE TO THINK THAT THIS IS ALL RETALIATORY? OR DO THEY --

**MS. LAFOUNTAIN:** AND THEY -- AND WE -- AND THEY INVESTIGATED, I MEAN, IT COULD BE.

**THE COURT:** BUT, I MEAN, SHE IS THE ONE THAT GOT FIRED.

**MS. LAFOUNTAIN:** (INAUDIBLE) THAT?

**THE COURT:** MS. DAVIS?

**MS. LAFOUNTAIN:** SIR?

**THE MINOR:** YEAH.

**THE COURT:** DAVIS IS THE ONE THAT GOT FIRED? AND GOT -- AND GOT CHARGED?

**MS. LAFOUNTAIN:** YEAH.

**THE MINOR:** HER AND NASH, LIKE, THEY WAS --

**MS. LAFOUNTAIN:** NOPE, HER NAME NASH.

**THE MINOR:** NASH AND DAVIS, LIKE, THEY -- THEY PARTNERS. LIKE, THEY -- THEY WORKED IT. THEY HOMEGIRLS --

**MS. LAFOUNTAIN:** AND THE LADY -- YEAH, HER NAME WAS NOT DAVIS.

**THE COURT:** OKAY.

**THE MINOR:** LIKE, THEY BEST FRIENDS. LIKE, THEY BOTH BEST FRIENDS.

**THE COURT:** WELL, I'M GOING TO -- IS -- IS THIS THE FIRST TIME Y'ALL HEARING THIS, OR NOT THE FIRST TIME Y'ALL HEARING THIS?

**MS. ROBINSON:** IT'S THE FIRST TIME THAT I'M HEARING IT.

**THE COURT:** MS. LAFOUNTAINE, IS THIS -- IS THIS THE FIRST TIME YOU'RE HEARING ALL THIS OR, NO?

**MS. LAFOUNTAIN:** YOU KNOW, THE KIDS THEY WROTE ARP'S, I'M NOT PRIVY TO WHAT HAPPENED AFTER THEIR ARP'S ARE WRITTEN, BUT THEY WROTE, YOU KNOW, TURNED IN EVERY ARP THAT WAS GIVEN TO ME. I REPORTED WHAT WAS REPORTED TO ME.

**THE COURT:** BUT THIS ISN'T -- SO, WHAT I'M ASKING, THIS ISN'T THE FIRST TIME YOU'RE HEARING THIS; RIGHT?

**MS. FOUNTAINE:** NO, SIR.

**THE MINOR:** LIKE, THEY MACING US. THE MACING US FOR NO REASON. LIKE, THEY'LL MACE US AND THEN THEY'LL -- THEY BRING THEIR OWN CAN OF MACE. THEY'LL GO BUY MACE IN A STORE AND BRING IT BACK TO THE FACILITY AND MACE KIDS, AND THEY GOT THE -- THE MACE THAT THEY GET, THEY'LL STILL HAVE IT FOR THEM; AND LIKE, WHEN THEY

WEIGHT IT, THEY'LL WEIGH THE SAME CAUSE THAT'S NOT THE MACE THAT THEY MACED US WITH. THEY MACED US WITH THEIR OWN MACE, THE MACE THAT THEY BROUGHT.

AND THEY'LL TAKE YOU IN A CELL, PUT YOU IN THERE WITH NO CAMERAS IN IT, JUST BEAT YOU UP ALL DAY.

**THE COURT:** MR. ROTHKAMM.

**MR. ROTHKAMM:** I'M GOING TO ASK THE COURT, I MEAN, HIS MATTERS IN DISTRICT COURT HAVE BEEN RESOLVED, HE'S ON PROBATION, HE WILL HAVE A PROBATION OFFICER LOOKING AFTER HIM, HE'S GOT CONDITIONS TO DO, WE GOT PROBATION. I THINK HE'S THREE HOURS AWAY FROM RECEIVING HIS HIGH SCHOOL DEGREE.

**THE COURT:** WHAT'S THE -- SO, WHAT'S THE PROBATION CONDITIONS?

**MR. ROTHKAMM:** I -- I GOT THEM RIGHT HERE. I WAS GOING TO PRINT THEM OUT AND I FORGOT. I'M SORRY. HE'S GOT -- HIS SENTENCE IS HE'S GOT -- HE PLED TO ILLEGAL USE OF A WEAPON AND AN ATTEMPT SIMPLE BURGLARY. HE'S GOT TWO YEARS DOC, CREDIT FOR TIME SERVED. SIX YEARS DOC, CONCURRENT, SUSPENDED, THREE YEARS ACTIVE SUPERVISED PROBATION. $200 PLUS COURT COST. THE DAY REPORTING CENTER, WHICH IS -- ARE YOU FAMILIAR WITH THAT?

**THE COURT:** THAT'S NEW. YEAH, WE'RE FAMILIAR WITH IT.

**MR. ROTHKAMM:** WELL, THE PROBATION AND PAROLE HAS SET UP A PROGRAM WHILE UNTIL THEY FINISH SCHOOL OR GET THEIR GED, OR UNTIL THEY GOT A FULL-TIME JOB, THEY GO TO PROBATION AND PAROLE EVERY DAY. THEY SIT THEM AND THEY -- THEY DO ALL THE CLASSES AND THEY GET EVERYTHING DONE THAT WAY.

THEY ORDERED GED OR SCHOOL. RANDOM DRUG TESTING.

THEFT CLASS. LIKE SKILLS PROGRAM THROUGH PROBATION AND PAROLE. AND HE HAS THE POSSIBILITY OF AN 893 ON THE BACK END, IF HE COMPLETES EVERYTHING AND DOES WHAT HE'S SUPPOSED TO DO.

**THE COURT:** YOU KNOW WHAT AN 893 IS?

**THE MINOR:** NO, SIR.

**THE COURT:** WELL, 893 IT MEANS THAT AT THE END OF ALL OF THIS IF YOU ARE -- IF YOU SUCCESSFULLY COMPLETE YOUR PROBATION YOU GOT TO THE JUGE AND ASK THAT JUDGE TO DISMISS THE WHOLE THING, SO IT'S LIKE YOU WERE NEVER EVEN CONVICTED IN THE FIRST PLACE.

**THE MINOR:** THAT'S A BIG --

**THE COURT:** IT'S A BIG DEAL, RIGHT. SO, LIKE, WHEN YOU FILL OUT A JOB APPLICATION AND THEY ASK HAVE YOU BEEN CONVICTED OF A CRIME, YOU WILL BE ABLE TO SAY NO.

**MS. ROBINSON:** AND, JUDGE, HE SAID HE WAS INTERESTED IN GOING TO THE MILITARY AFTER JJS (INAUDIBLE) THAT WILL HELP HIM IF HE DOES WHAT HE NEEDS TO DO.

**THE COURT:** WELL, I TELL YOU, IF YOU ARE INTERESTED IN GOING TO THE MILITARY, YOU NORMALLY DON'T HAVE TO TELL ANYBODY ABOUT THE STUFF THAT HAPPENS IN JUVENILE COURT, YOU GOT TO TELL THEM ABOUT IT, CAUSE IF YOU TO -- IF YOU TELL THEM NO, THEY LOOK AT IT AS LIKE YOU'RE LYING TO THEM AND THEY SOMEHOW THEY FIND OUT. I DON'T HOW THEY DO, BUT THEY ALWAYS FIND OUT.

WELL, I MEAN, I'M CONCERNED, OBVIOUSLY, ABOUT WHAT I'M HEARING. LIKE, YOU KNOW, I'M -- I'M CONCERNED ABOUT SOME OF THESE -- (INAUDIBLE). I'VE SEEN WORSE. BUT I GET THE -- THE CONTRABAND, BUT THEN

I'M NOT EVEN... SURE, LIKE, THE CONTRABAND, SO I'M NOT -- I'M NOT A HUNDRED PERCENT SURE WHAT'S GOING ON. (INAUDIBLE). ALL RIGHT.

MS. PLAISANCE, ANYTHING?

**MS. PLAISANCE:** (INAUDIBLE) Y'ALL RECEIVED THIS MANY WRITE-UPS. I WILL HAVE -- YOU KNOW, I WOULD HAVE CONCERN, BUT NOW, LIKE, WITH THE ALLEGATIONS THAT, YOU KNOW, A STAFF MEMBER HAVING IN- -- INAPPROPRIATE RELATIONSHIP, I DON'T KNOW HOW MUCH OF THIS IS, YOU KNOW, RETALIATORY, AND YOU KNOW, WARRANTED.

**THE COURT:** CAN Y'ALL APPROACH.

(AT THIS TIME, THERE WAS AN UNRECORDED SIDEBAR CONFERENCE. THE MATTER RESUMED AS FOLLOWS:)

**THE COURT:** ALL RIGHT. MS. LAFOUNTAINE, WHAT MR. J[redacted] NEED TO KEEP WORKING ON RIGHT NOW?

**MS. LAFOUNTAINE:** I SPOKE TO MOM YESTERDAY ABOUT -- I WENT TO THE SCHOOL; I GOT HIS CREDITS. HE HAS 15 ½ CREDITS. THEY TOLD US ABOUT A SCHOOL CALLED GREAT RESULTS IN CARRINGTON, TEXAS. IT'S ONLINE BASED AND IT'S CALIFORNIA ACCREDITED. IF HE ENROLLS IN THAT, HE ONLY NEEDS 14 ½ CREDITS TO GRADUATE, BUT HE HAS TO TAKE A HALF CREDIT OF P.E. I, ONE VOCATIONAL CLASS, WORLD GEOGRAPHY, P.E., AND HEALTH, AND THEN HE WILL HAVE HIS HIGH SCHOOL DIPLOMA.

SO, I TALKED TO MOM ALREADY. IF HE WERE TO BE RELEASED, SHE ALREADY KNOWS. I TALKED TO THE SCHOOL; THIS IS WHERE I GOT THIS INFORMATION FROM. ALL THEY WOULD DO IS DROP J[redacted] TRANSFER HIS STUFF THERE, AND HE CAN ENROLL; AND THIS IS AN ONLINE BASE AND J[redacted] WILL HAVE HIS HIGH SCHOOL DIPLOMA.

**MR. ROTHKAMM:** AND, JUDGE, I --

**MS. ROBINSON:** IT'S 14 ADDITIONAL CREDITS WHO

I'M NOT EVEN... SURE, LIKE, THE CONTRABAND, SO I'M NOT -- I'M NOT A HUNDRED PERCENT SURE WHAT'S GOING ON. (INAUDIBLE). ALL RIGHT.

MS. PLAISANCE, ANYTHING?

**MS. PLAISANCE:** (INAUDIBLE) Y'ALL RECEIVED THIS MANY WRITE-UPS. I WILL HAVE -- YOU KNOW, I WOULD HAVE CONCERN, BUT NOW, LIKE, WITH THE ALLEGATIONS THAT, YOU KNOW, A STAFF MEMBER HAVING IN- -- INAPPROPRIATE RELATIONSHIP, I DON'T KNOW HOW MUCH OF THIS IS, YOU KNOW, RETALIATORY, AND YOU KNOW, WARRANTED.

**THE COURT:** CAN Y'ALL APPROACH.

(AT THIS TIME, THERE WAS AN UNRECORDED SIDEBAR CONFERENCE. THE MATTER RESUMED AS FOLLOWS:)

**THE COURT:** ALL RIGHT. MS. LAFOUNTAINE, WHAT MR. JOSEPH NEED TO KEEP WORKING ON RIGHT NOW?

**MS. LAFOUNTAINE:** I SPOKE TO MOM YESTERDAY ABOUT -- I WENT TO THE SCHOOL; I GOT HIS CREDITS. HE HAS 15 ½ CREDITS. THEY TOLD US ABOUT A SCHOOL CALLED GREAT RESULTS IN CARRINGTON, TEXAS. IT'S ONLINE BASED AND IT'S CALIFORNIA ACCREDITED. IF HE ENROLLS IN THAT, HE ONLY NEEDS 14 ½ CREDITS TO GRADUATE, BUT HE HAS TO TAKE A HALF CREDIT OF P.E. I, ONE VOCATIONAL CLASS, WORLD GEOGRAPHY, P.E., AND HEALTH, AND THEN HE WILL HAVE HIS HIGH SCHOOL DIPLOMA.

SO, I TALKED TO MOM ALREADY. IF HE WERE TO BE RELEASED, SHE ALREADY KNOWS. I TALKED TO THE SCHOOL; THIS IS WHERE I GOT THIS INFORMATION FROM. ALL THEY WOULD DO IS DROP JOSEPH, TRANSFER HIS STUFF THERE, AND HE CAN ENROLL; AND THIS IS AN ONLINE BASE AND JOSEPH WILL HAVE HIS HIGH SCHOOL DIPLOMA.

**MR. ROTHKAMM:** AND, JUDGE, I --

**MS. ROBINSON:** IT'S 14 ADDITIONAL CREDITS WHO

WOULD NEED?

THE COURT: NO, I THINK HE'S ALREADY GOT.

MS. ROBINSON: OH, OKAY. HE HAS 14.

MS. LAFOUNTAIN: HE HAD --

THE COURT: SOME OF THESE HE'S ALREADY HAVE. HE JUST NEEDS --

MS. LAFOUNTAIN: YEAH, HE ALREADY HAD THE AMOUNT OF CREDIT WHEN -- THEY JUST COMPARED HIS COURSES TO HIS TRANSCRIPT. THEY HAVE TO HAVE, LIKE, ENGLISH I, ENGLISH II; HE HAD THAT. ALGEBRA, CIVICS, U.S. HISTORY, PERSONAL FINANCE. SO, WHAT HE WAS MISSING IS WORLD GEOGRAPHY, THE HALF CREDIT OF P.E. I, AND A VOCATIONAL COURSE, P.E. II, AND HEALTH, THAT'S IT.

MS. ROTHKAMM: AND, JUDGE, I'M ABLE TO SPEAK WITH JUDGE RAY AT DISTRICT COURT AND HAVE HER ADD CONDITIONS THAT HE COMPLETE THOSE PROGRAMS THROUGH THAT SCHOOL. WE DO HAVE INFORMATION FOR THAT SCHOOL PLACEMENT.

THE COURT: ALL RIGHT. AT THIS POINT, J[redacted], I MEAN, I'M CONCERNED ABOUT EVERYTHING THAT YOU SAID. I THINK YOU NEED TO TALK WITH MR. ROTHKAMM A LITTLE BIT MORE ABOUT SOME OF THAT STUFF. ALL RIGHT. THERE MAY BE SOME OTHER REMEDIES, IF YOU WANT TO PURSUE. ASSUMING ALL -- ASSUMING EVERYTHING YOU'RE TELLING ME IS TRUE.

SO, AT THIS POINT, IF YOU CAN CONTINUE ON ADULT PROBATION AND PAROLE, HAS THE RESOURCES AVAILABLE. AT THIS POINT, I DON'T KNOW THAT I'M DOING ANY GOOD KEEPING YOU HERE. SO, I'M GOING TO ORDER YOUR DISPOSITION BE TERMINATED. YOU'LL BE RELEASED BACK INTO (INAUDIBLE).

MS. SCOTT: THANKS.

THE COURT: YOU ARE STILL ON ADULT PROBATION.

MS. ROBINSON: BUT YOU DON'T HAVE TO DEAL WITH JUVENILE --

THE COURT: YOU WON'T DEAL WITH ME ANYMORE; YOU STILL GOT TO DEAL WITH ADULT PROBATION. HEY, LISTEN, I NEED -- I NEED YOU TO UNDERSTAND, LIKE, THAT 893 IS A BIG DEAL. ALL RIGHT. SO, YOU NEED TO COMPLETE PROBATION, AND THEN YOU NEED TO NOT DO ANYTHING ELSE STUPID.

THE MINOR: YES, SIR.

THE COURT: RIGHT, LIKE, AT THE END OF THE DAY THAT'S WHAT IT IS, BECAUSE LIKE, MR. ROTHKAMM GOT YOU A 893. NOW, HE'S NOT A MIRCALE WORKER. ALL RIGHT. IF YOU GET IN TROUBLE AGAIN --

MS. SCOTT: THAT'S IT.

THE COURT: LIKE, NOT ONLY ARE YOU NOT GOING TO GET THAT 893, BUT YOU'LL BE STUCK WITH WHATEVER YOU GOT NEW.

THE MINOR: YES, SIR.

THE COURT: GOOD LUCK JOINING THE MILITARY, IF THAT'S WHAT YOU WANT TO DO. ALL RIGHT. GOOD LUCK WITH A WHOLE -- GOOD LUCK WITH A WHOLE BUNCH OF STUFF.

MS. SCOTT: THANK HIM AND THANK WHO?

THE MINOR: THANK GOD.

MS. SCOTT: ALL RIGHT.

THE COURT: AND WHO?

THE MINOR: MY MOMMA.

THE COURT: SHE BEEN HERE WITH YOU.

MS. SCOTT: THE WHOLE TIME.

THE COURT: RIGHT.

THE MINOR: AND MY GRANDMA (INAUDIBLE).

THE COURT: BUT LET ME ASK YOU A QUESTION. HAVE

YOU DESERVED THEM SUPPORTING YOU THIS WHOLE TIME? HAVE YOU DESERVED THIS?

**MR. ROTHKAMM:** NO.

**THE MINOR:** NO, NOT REALLY.

**THE COURT:** NO, YOU HAVEN'T.

**THE MINOR:** WHAT I PUT HER THROUGH THIS TIME --

**THE COURT:** THAT'S -- YOU -- YOU HAVE, BUT GUESS WHAT? SHE MAY STILL BE HERE.

**THE MINOR:** AND I -- I TAKE ACCOUNTABILITY TO THAT.

**THE COURT:** THEY NOT HERE BECAUSE YOU DESERVE IT. THEY'RE HERE BECAUSE THEY LOVE YOU, RIGHT. AND SO, LOOK, HUNDRED -- HUNDRED PERCENT. NOW, AND THIS IS -- THIS IS MAYBE ONE OF MY NEW LITTLE THINGS, BECAUSE (INAUDIBLE), TALKING ABOUT THE DIFFERENCE BETWEEN BEING A CHILD AND BEING A MAN, RIGHT. A CHILD LOOKS AT THE WORLD AND SAYS, WHAT DO YOU HAVE FOR ME, RIGHT, OR WHAT CAN YOU GIVE? RIGHT. A MAN LOOKS AT THE WORLD AND SAYS WHAT CAN I GIVE YOU? RIGHT.

SO, WHEN YOU HAVE A FAMILY AND YOU HAVE PEOPLE IN YOUR FAMILY, A CHILD SAYS WHAT CAN YOU GIVE ME. RIGHT. AND WHEN YOU BECOME A MAN, YOU LOOK AT YOUR FAMILY AND SAY WHAT CAN I GIVE YOU, HOW CAN I SUPPORT YOU? RIGHT. THAT'S THAT TRANSITION THAT YOU HAVE MADE NOW. RIGHT. THEY BEEN GIVING, AND GIVING, GIVING, GIVING, GIVING, GIVING. IT'S TIME FOR YOU TO FLIP IT BACK, RIGHT, AND LOOK AROUND AND SAY NOT WHAT -- NOT WHAT CAN YOU GIVE ME, RIGHT, WHAT CAN I GIVE YOU. THAT'S WHERE YOU NEED TO BE, RIGHT. AND GIVE THEM -- AND COME WHATEVER WAYS, TO SUPPORT, YOU KNOW, THIS -- WHATEVER THIS, EMOTIONAL SUPPORT, ALL THAT STUFF, RIGHT, BUT IT'S ALSO STAYING OUT OF TROUBLE AND

NOT FORCING THEIM TO CONTINUE TO SUPPORT YOU LIKE THIS.

**THE MINOR:** OKAY.

**THE COURT:** THAT'S IT. THE LAST THING I'M ABOUT TO ASK YOU, WHERE'S YOUR DAD?

**THE MINOR:** I DON'T KNOW MY DAD. WELL, I KNOW HIM, BUT I AIN'T BOUT (INAUDIBLE).

**THE COURT:** OKAY.

**THE MINOR:** I ONLY HAVE MY MOM AND MY GRANDMA. (INAUDIBLE).

**THE COURT:** SO, THIS IS THE DEAL, RIGHT, AND THIS IS WHAT I WILL TELL YOU. THIS THE LAST THING I'M GOING TO SAY, AND WHAT I'M GOING TO ENCOURAGE YOU ON THIS, IS THAT THE YOUNG MEN THAT I HAVE INCIDENTALLY THAT I CONTINUE TO SEE YOU OVER AND OVER AGAIN, THEIR DADS ARE ALREADY HERE. RIGHT. MOST OF THE TIME, WHEN I HAVE SOMEBODY THAT GOT MOM AND DAD BOTH HERE, RIGHT, I MAY SEE SOMEBODY ONE TIME, BUT A LOT OF TIMES THAT'S IT. YOU KNOW, CAUSE YOU MAY LOOK AROUND AND YOU MAY NOT REALIZE OR SIT HERE AND THINK THAT, LIKE, (INAUDIBLE) WHAT I'M TELL YOU IS, LIKE, DEEP DOWN, YOU DESERVE TO HAVE YOUR DAD IN YOUR LIFE. IT'S NOT YOUR FAULT THAT HE'S NOT HERE.

**MS. SCOTT:** CORRECT.

**THE COURT:** RIGHT. BUT THAT IMPACTS YOU. WHETHER YOU REALIZE IT OR NOT, RIGHT, THAT IMPACTS YOU. AND I DON'T KNOW IF YOU EVER TALKED ABOUT THIS WITH ANYBODY OR DO ANY OF THAT, BUT MY ENCOURAGEMENT TO YOU IS THAT, LIKE, YOU WORK THROUGH THAT AND YOU RECOGNIZE THAT, YEAH, YOU ARE MISSING SOMETHING. IT'S NOT YOUR FAULT THAT YOU'RE MISSING IT, SO WHAT ARE YOU GOING TO DO NEXT? LIKE, WHAT ARE YOU GOING TO DO WITH

THAT? WHEN ARE YOU GOING TO RECOGNIZE THAT SOME -- A LOT OF TIMES THAT LACK OF HAVING A MAN IN YOUR LIFE IS WHAT DRIVES SOME OF YOUR BAD DECISIONS, RIGHT. AND YOU AIN'T GONE REALIZE IT THAT'S WHAT HAPPENED. OKAY.

NOW, THERE'S GOING TO COME A POINT WHERE YOU'RE GOING TO WANT TO HAVE A FAMILY, I'M GUESSING, RIGHT, YOU'RE GOING TO WANT TO HAVE KIDS.

**THE MINOR:** YES, SIR.

**THE COURT:** OKAY. ARE YOU GOING TO WANT TO BE LIKE YOUR DAD?

**THE MINOR:** NO.

**THE COURT:** YOU'RE GOING TO WANT TO BE THERE; RIGHT? YEAH? OKAY. SO, THIS IS THE THING. ALL OF THE BAD DECISIONS, THE HURT, AND EVERYTHING THAT -- THAT IS GOING ON WITH YOU, RIGHT, IF YOU DON'T DEAL WITH IT, YOU'RE GOING TO VISIT ALL OF THIS ON YOUR OWN KIDS IN THE FUTURE, RIGHT. IT'S NOT A -- IT WON'T STOP WITH YOU, UNLESS YOU DECIDE THAT TODAY, RIGHT, TO TURN AROUND AND SAY NO.

LIKE, I -- I HAD IT ROUGHT, RIGHT, BUT I WANT TO MAKE SURE MY KIDS DON'T HAVE IT LIKE THIS, RIGHT. I'M GONE STOP THIS. LIKE, I'M GONE STOP IT. NOBODY ELSE CAN DO THAT, YOU CAN DO THAT. OKAY. BUT YOU CAN ONLY DO THAT IF YOU TURN AROUND AND REALIZE THAT, LIKE, YEAH, THIS HAS AFFECTED ME, AND YOU DEAL WITH IT.

SO, MY ENCOURAGEMENT TO YOU IS THAT WHEN YOU GET CONNECTED WITH A COUNSELOR, IF YOU NEED SOME HELP, IT'S LIKE, YOU DO THAT, AND YOUR MOM SAID YOU CAN DO THAT, RIGHT, AND THAT YOU TALK ABOUT DAD, RIGHT. AND I DON'T KNOW YOU THAT WELL, BUT LIKE I KNOW THAT IT AFFECTED YOU.

**THE MINOR:** YOU KNOW ME.

**THE COURT:** YEAH, I MEAN, I KNOW THAT IT'S -- I KNOW THAT YOU MIGHT NOT WANT TO TALK ABOUT IT, YOU MAY NOT WANT TO THINK ABOUT IT, BUT ABSOLUTELY HAS; RIGHT?

**THE MINOR:** YES, SIR.

**THE COURT:** AND SO, CAUSE YOU (INAUDIBLE), AND -- AND SO, YOU NEED TO DEAL WITH THAT, RIGHT. AND SO, THAT'S MY ENCOURAGEMENT TO YOU IS WHEN YOU WALK OUT OF HERE AND YOU DO THAT, THEN YOU ADDRESS THAT, BECAUSE THAT WILL HELP YOU IN THE FUTURE JUGGLING WITH YOUR OWN LIFE, BUT IT WILL ABSOLUTELY -- IF YOU GOT KIDS IN THE FUTURE, IT WILL ABSOLUTELY MAKE THEIR LIFE BETTER IF YOU DEAL WITH IT. ALL RIGHT.

**THE MINOR:** YES, SIR.

**THE COURT:** GOOD LUCK, MAN.

**MS. SCOTT:** I HAVE A QUESTION.

**THE COURT:** YES.

**MS. SCOTT:** HIS MEDICATION THAT HE'S ON, IS THEY GOING TO SEND ME A COPY OF THE MEDICATION LIST, SO WHEN I TAKE HIM TO THE PSYCHIATRIST WHERE I CAN PUT HIM ON THE SAME THING HE WAS ALREADY ON?

**MS. LAFOUNTAIN:** YES, MA'AM. WHEN I DISCONNECT FROM HERE, I'M GOING TO GO TO THE INFIRMARY AND LET THEM KNOW THAT HE'S RELEASED. I'M GOING TO GET WITH HIS MHP AND TRY TO GET THE PLAN SENT OVER TO YOU ALL; AND, YOU KNOW, I HAVE EMAILS, I KNOW YOUR NUMBER BY HEART.

**MS. SCOTT:** OKAY. THANK YOU.

**MS. LAFOUNTAIN:** LOVE Y'ALL. TAKE CARE OF MY BOY.

**THE COURT:** THANK YOU.

**MS. SCOTT:** AND I APPRECIATE EVERYTHING YOU HAVE DONE. YOU'RE THE BEST.

MS. LAFOUNTAIN: Y'ALL GONE MAKE ME CRY. YES, MA'AM, THANK YOU.

MS. SCOTT: OKAY.

THE COURT: ALL RIGHT. GOOD LUCK, MAN.

THE MINOR: THANK YOU.

MR. ROTHKAMM: THANK YOU, JUDGE.

MS. SCOTT: I APPRECIATE YOU. WE SAVED HIM TOGETHER, AS A TEAM.

THE COURT: THAT'S RIGHT. HEY, (INAUDIBLE), RIGHT.

MS. SCOTT: IT'S A TEAM. I TELL HIM THAT ALL THE TIME, IT GOT KIDS WALK OUT OF HERE THEY GET KILLED AND EVERYTHING ELSE, IT'S TIME TO TURN IT AROUND --

THE COURT: THAT'S RIGHT.

MS. SCOTT: -- AND GO ANOTHER ROUTE.

THE COURT: THERE YOU GOT. YOU GOT IT. ALL RIGHT.

MS. SCOTT: THANK YOU SO MUCH. Y'ALL HAVE A GOOD ONE. BYE-BYE. I WON'T SEE YOU HERE, BUT I'LL SEE YOU IN THE STREETS.

THE COURT: ALL RIGHT.

(END OF TRANSCRIPT.)

************

PREA STANDARDS IN FOCUS

NATIONAL PREA RESOURCE CENTER

# 115.61 Staff and agency reporting duties

## Standard in Focus

EAST BATON ROUGE PARISH C-778932
Filed May 27, 2026 2:20 PM 27
Deputy Clerk of Court

### Staff and agency reporting duties

§115.61

**a)** The agency shall require all staff to report immediately and according to agency policy any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

**b)** Apart from reporting to designated supervisors or officials, staff shall not reveal any information related to a sexual abuse report to anyone other than to the extent necessary, as specified in agency policy, to make treatment, investigation, and other security and management decisions.

**c)** Unless otherwise precluded by federal, state, or local law, medical and mental health practitioners shall be required to report sexual abuse pursuant to paragraph (a) of this section and to inform inmates of the practitioner's duty to report, and the limitations of confidentiality, at the initiation of services.

**d)** If the alleged victim is under the age of 18 or considered a vulnerable adult under a state or local vulnerable persons statute, the agency shall report the allegation to the designated state or local services agency under applicable mandatory reporting laws.

**e)** The facility shall report all allegations of sexual abuse and sexual harassment, including third-party and anonymous reports, to the facility's designated investigators.

## Purpose

- To establish a strong, effective reporting culture among staff and ensure that the agency and facility receive timely information about sexual abuse, sexual harassment, retaliation, and staff neglect, or violations of responsibilities that may have contributed to an incident or retaliation. The standard requires the agency to ensure that facility staff report all allegations while also taking steps to protect the confidentiality of sexual abuse information by sharing internally with only those who need to know.

- To build confidence and trust in the reporting system and help minimize a victim's fear of reporting and possible retaliation by requiring that inmates be informed up front about the limits of confidentiality when receiving medical and mental health services. Robust reporting requirements and a system that values and protects confidentiality help create healthy, open, and safe environments that enhance protections for victims.

EXHIBIT B

CERTIFIED TRUE AND CORRECT COPY
JUL 2 9 2026
East Baton Rouge Parish
Deputy Clerk of Court

## Implementation

### Internal reporting

- The **agency** must have a **policy** to:
  - Require all staff members, including medical and mental health practitioners, to immediately report any knowledge, suspicion, or information of any incident in any facility, even in a facility that is not a part of the agency, regarding:
    - Sexual abuse or sexual harassment.
    - Retaliation against an inmate or staff who reported an incident of sexual abuse or sexual harassment.
    - Staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.
  - Require medical and mental health practitioners to inform inmates of their duty to report incidents and any limitations of confidentiality at the beginning of the medical or mental health services (unless otherwise precluded by federal, state, or local law). This requirement should also be included in contractual agreements if the medical and/or mental health staff provide services to the agency or facility per a contract.
  - Identify those individuals with a need to know who may receive information related to sexual abuse reports to allow decisions to be made about treatment, investigations, and other security and management issues.
  - Prohibit staff from revealing information related to a sexual abuse report to anyone other than individuals specified in the agency reporting policy.
- The **facility** must ensure that all allegations of sexual abuse and sexual harassment, including third-party and anonymous allegations, are reported to the facility's designated investigators.

### External Reporting

- The **agency** must comply with applicable state or local mandatory reporting laws and report any sexual abuse allegations concerning any victim under the age of 18, or any victim considered a vulnerable adult, to the designated state or local services agency as required by state or local law.

## Challenges

- Overcoming any potential staff "code of silence" or fear of retaliation, especially when allegations or suspicions concern the conduct of other staff.
- Fostering a culture where staff value their own personal integrity above loyalty to any code of silence and creating an environment where staff are engaged and willing to report red flags they have observed and suspicions they may have regarding those with whom they work, including those within the chain of command.
- Educating staff that they cannot judge the validity or merit of any allegation, and that they must report every allegation, even if it is based on "hearsay" or "rumor."
- Establishing clear reporting protocols and clearly identifying the chain of reporting.

- Identifying the individuals who need to know certain information relating to a sexual abuse report and ensuring that those individuals receive no more information than is strictly necessary to make treatment, investigation, and other security and management decisions.
- Ensuring that authorized staff who are privy to information regarding sexual abuse allegations maintain and protect the confidentiality of the information.
- Identifying any applicable state or local reporting laws, determining which staff are considered mandatory reporters, and training these staff on their specific roles and responsibilities as mandatory reporters.

## Best Practices

- Agency **policy** on staff reporting duties should clearly explain, at a minimum, the following:
  - **Who is required** to report under the policy:
    - All employees and contract staff. This includes medical and mental health practitioners, specifically including practitioners who work directly for the agency or facility, and practitioners who work pursuant to a contractual agreement with the agency or facility.
    - *Note:* Reporting requirements for medical and mental health practitioners should also be included in relevant medical and mental health policies, which should be cross-referenced in the staff reporting policy.
  - **What type of incident** must be reported:
    - Any incident of either sexual abuse or sexual harassment that may have happened *in any correctional facility, including*:
      - In the facility where the staff member works.
      - In another facility within the agency.
      - In a facility outside the agency entirely.
    - Retaliation against *inmates or staff* who reported such an incident.
    - Any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.
  - **What level of awareness** must be reported:
    - The standards require the reporting of any *knowledge, suspicion, or information* regarding an incident of sexual abuse or sexual harassment. These terms are discussed below:
      - *Knowledge of an incident* is when a staff member knows for certain that something happened, based on firsthand knowledge (i.e., the staff person saw and/or heard the incident); or the staff person is told about an incident by someone who witnessed it firsthand.
      - *Suspicion that an incident may have occurred* is when a staff person thinks, but is not totally certain, that something may have happened or is happening. Suspicion may be based on "red flags,"[1] or hearing others

talk about possible sexual abuse or sexual harassment.

- *Information regarding an incident* is when a staff person has been told something or receives a note or "kite" from an inmate about an incident. The information may be second-hand and not based on the reporter's personal knowledge or firsthand observations.

**Important notes on reporting knowledge, suspicion, and information**

"Hearsay" or "rumors" are types of information from other people that one cannot adequately substantiate or prove. Staff members are required to report all information they have about instances of sexual abuse and sexual harassment, **including rumors and hearsay**.

It is important to emphasize in policy that staff members must report knowledge, suspicion, and information, regardless of whether staff personally believe the information to be true or reliable.

Staff must also report knowledge, suspicion, and information regardless of whether an incident is under investigation, or even if an investigation about the incident has already been completed.

- Who receives reports:
  - Policies should clearly explain to whom staff members must report sexual abuse and sexual harassment, for all types and levels of staff members:
    - Non-uniform or civilian staff members typically are required to report directly to their immediate supervisor.
    - Uniform staff typically are required to report according to the established chain of command. However, some facilities require all reports of sexual abuse and sexual harassment to be made to the facility head or warden.
    - Uniform and civilian supervisory staff should be required to report to higher levels, including to the facility head/warden.
    - The PREA Compliance Manager, PREA Coordinator, and facility head should receive all reports and the policy should specify exactly how

---

[1] A few common examples of "red flags" that may indicate that sexual abuse or sexual harassment by another inmate or staff member is or may be occurring **include, but are not limited to:**

- Changes in an inmate's behavior for no apparent reason; inmates in unauthorized areas or repeatedly out of their assigned place; horse-play, sexualized interaction between staff and inmates;
- Staff granting special requests, showing favoritism, or spending unexplainable amounts of time with an inmate; staff being overly concerned about an inmate or over-identifying with the inmate or their issues.
- Inmate refuses to take showers or, undress in shower, or seeks to be alone or isolated from a particular inmate;
- Conversations between staff and inmate are sexualized in nature; staff take inmates out of cell at unusual times; staff have excessive knowledge about inmate and his/her family situation; staff work in secluded areas with inmate(s); staff defend an inmate; staff in facility during "off hours";
- Inmate knows personal information about staff; inmate has letters or photos of staff; and
- Inmate appears to have more personal items or food than others; inmate improving his/her appearance, dress, make-up, hair.

they must receive the reports.

  - The policy must specify who in a facility is required to report all allegations of sexual abuse and sexual harassment, including third-party and anonymous reports, to the facility's designated investigators.
  - The policy must specifically identify any other individuals to whom staff may or must reveal information related to a report of sexual abuse or sexual harassment.

- When to report:
  - Staff members must report immediately and according to agency policy. This requirement allows for immediate verbal notification and for written reports pursuant to policy, which may provide additional time. Policies and training should educate staff on the specific meaning of the term "*immediately*."
- How to report:
  - Staff members must be allowed to make reports orally (e.g., in person, by phone, or by radio/facility communication device).
  - Staff should be required to make the report in writing within a defined time period (e.g., by the end of the staff member's shift, within 24 hours, or during some other appropriate period that is clearly stated in policy).

- Agencies should provide effective training to staff members on their reporting duties.
  - Trainings should cover all aspects of the reporting policy, including the specific staff members who are in the reporting chain; the requirement imposed on all staff members to make reports of alleged incidents of sexual abuse and sexual harassment that come from third-party and anonymous sources; the time frame for reporting; methods for reporting; and documentation requirements.
  - Trainings should focus on why "*hearsay*" and "*rumors*" regarding sexual abuse and sexual harassment must be reported and should describe how the information can be used to enhance safety.
  - Staff members should be trained on recognizing "*red flags*" that can both indicate abuse and help prevent abuse.
  - Staff members must understand that they cannot make any decisions on the merit of the allegations; all allegations must be reported, regardless of a staff member's opinion about the validity or merit of the information.
  - Trainings for staff members should focus on retaliation and fear of retaliation, which often keep victims and staff members from reporting sexual abuse and sexual harassment. Such trainings should emphasize that the agency and the facility do not tolerate retaliation, and steps that staff members can take if they experience or are concerned about retaliation.
  - Trainings for staff members should focus on personal integrity and emphasize that the codes of silence that may have existed in agencies and facilities previously are not acceptable and will not be tolerated.

- **Mandatory reporting:** Agencies and facilities should work with their general counsels or other legal representatives, and medical and mental health staff to determine whether they are subject to mandatory reporting laws. Mandatory reporting laws vary by jurisdiction and identify classes of people who are required to report abuses of specified vulnerable populations, including minors and elderly people, to external protection agencies.

## Audit Issues

- Auditors must review agency policy to ensure that it requires all staff to report any knowledge, suspicion, or information regarding any incident of sexual abuse or sexual harassment that occurred in a facility, regardless of whether it happened in that agency; retaliation against inmates or staff who report such incidents; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.
- Auditors must review agency protocols to ensure that any sexual abuse allegation involving a victim who is under the age of 18 or who is considered a vulnerable adult under state or local statutes is reported to designated state or local service agencies, in accordance with all applicable mandatory reporting laws.
- Auditors must review contract language, if applicable, for contracted medical and mental health practitioners to confirm that they are required to report sexual abuse, and to inform inmates of their duty to report and their limitations of confidentiality at the initiation of services. Additionally, auditors must interview medical and mental health staff to corroborate their responsibilities regarding reporting and disclosure of their limits of confidentiality.
- Auditors are required to interview a random sample of line staff members for a variety of reasons, including to ensure that they are aware of their reporting duties and their responsibility not to reveal any information related to a sexual abuse or sexual harassment report to anyone other than those who must know the information. Auditors must also determine whether these limitations on the disclosure of information related to incidents of sexual abuse and sexual harassment are clearly outlined in agency policy.
- Auditors are obligated to review reports of sexual abuse and sexual harassment that are made to investigators, to evaluate whether agency staff members complied with their reporting responsibilities for all allegations.

## Standard Variations

The following variations in the standard are noted for **Lockups, Community Confinement Facilities**, and **Juvenile Facilities**. The variations are discussed in summary fashion below, but readers are encouraged to consult the full text of the specific set of standards to ensure a complete understanding of the differences.

- **Lockups:** The following differences are noted:
- The lockup standards require reporting about incidents of sexual abuse and sexual harassment that occur in an agency lockup facility only; the reporting requirements do not extend to facilities that are not part of the agency. For example, if a detainee in a lockup states to a staff member that s/he was sexually abused in a confinement facility prior to being placed in the lockup, the staff member may report this incident, but the lockup standards do not require the staff person to

do so.

- The lockup standards limit providing information about sexual abuse and sexual harassment, other than to designated supervisors and to staff members who are specified in agency policy who need the information to make treatment and investigation decisions. The lockup standards do not require incidents of sexual abuse and sexual harassment to be reported to staff members who are in charge of facility security and the day-to-day management of detainees.
- The lockup standards do not contain any requirements regarding reporting responsibilities or disclosure of limits of confidentiality for any medical or mental health practitioners. However, these practitioners may have obligations to disclose their limits of confidentiality that are based not on the lockup standards but on their own professional licensures and/or codes of professional responsibility. They may also be required by mandatory reporting laws in their particular state to disclose the limits of confidentiality.
- **Community Confinement:** None.
- **Juvenile:** The following differences are noted:
- The juvenile standards state that the agency must require all staff to comply with any applicable mandatory child abuse reporting laws. [§115.361(b)]
- The juvenile standards incorporate "designated State or local services agencies" into §115.361(c) as entities expected to receive information about sexual abuse and sexual harassment reports, in addition to the "designated supervisors or officials" identified in the prison and jail standards.
- The juvenile standards clarify that medical and mental health practitioners are required to report to the designated state or local services agency where required by mandatory reporting laws. These state or local agencies are typically child protective service agencies that investigate child abuse allegations. Notification to these agencies is necessary only if state law requires it. In some states, child abuse in juvenile confinement facilities is investigated by offices of inspectors general or other external investigative entities that are not part of the child protective service agencies. [§115.361(d)(1)]
- The juvenile standards add additional specific external reporting requirements:
  - (e)(1) Upon receiving any allegation of sexual abuse, the facility head or his or her designee shall promptly report the allegation to the appropriate agency office and to the alleged victim's parents or legal guardians, unless the facility has official documentation showing that the parents or legal guardians should not be notified.
  - (2) If the alleged victim is under the guardianship of the child welfare system, the report shall be made to the alleged victim's caseworker instead of the parents or legal guardians.
  - (3) If a juvenile court retains jurisdiction over the alleged victim, the facility head or designee shall also report the allegation to the juvenile's attorney or other legal representative of record within 14 days of receiving the allegation.

## Resources

### Frequently Asked Questions

➔ www.prearesourcecenter.org/frequently-asked-questions

The Department of Justice has issued extensive guidance regarding reporting obligations. Visit the PREA Resource Center's FAQ page and search under Standard 115.61 for the many related FAQ

responses provided by the Department of Justice. The FAQs to date are as follows:

- **November 18, 2015**. What are the agency's reporting obligations under Standard 115.361(e) in cases where a juvenile is an emancipated youth?

  ➔ www.prearesourcecenter.org/node/3812

- **September 28, 2015**. Are clergy employed by or who volunteer in a correctional facility bound by the mandatory staff reporting provision in Standard 115.61(a)? Is there any protection for confidential communication with clergy, and is there any special consideration for confidentiality within confessional communication?

  ➔ www.prearesourcecenter.org/node/3599

## PREA Resource Center Library

- PREA refresher
  - "Prisons & Jails PREA Refresher #8 – Reporting Knowledge, Suspicion, or Information" *(also available for community confinement and juvenile facilities)*:

    ➔ www.prearesourcecenter.org/training-and-technical-assistance/prea-refreshers

  - "PREA and Victim Services: A Trauma-Informed Approach Notification of Curriculum Utilization" *(reporting sexual abuse and sexual harassment PowerPoint)*:

    ➔ www.prearesourcecenter.org/sites/default/files/content/vs_curriculum_ppt_module_4_final.pdf

  - "Legal Responses to Sexual Violence in Custody: Using Existing State Mandatory Reporting Statutes to Improve Disclosure of Sexual Violence in Correctional Settings":

    ➔ www.prearesourcecenter.org/sites/default/files/library/legalresponsetosexualviolenceincustody-usingexistingstatemandatoryreportingstatuestoimprovedisclosur.pdf

  - "PREA Employee Training Notification of Curriculum Utilization:"

    ➔ www.prearesourcecenter.org/sites/default/files/content/unit_3.2_lesson_plan.pdf

  - "State of Wisconsin Department of Corrections PREA Flow Charts"
    - Reporting staff-on-inmate:

    ➔ www.prearesourcecenter.org/sites/default/files/library/wisconsinpreareportingflowchartstaffoninmate.pdf

    - Reporting inmate-on-inmate:

    ➔ www.prearesourcecenter.org/sites/default/files/library/wisconsinpreareportingflowchartinmateoninmate.pdf

## Archived Webinars on the PRC Website

## Additional Training Resources:

Always check the following sources for excellent training on PREA.

- National Institute of Corrections
  - ➔ nicic.gov/training/prea
- End Silence: The Project on Addressing Prison Rape
  - ➔ www.wcl.american.edu/endsilence

## Notes and Federal Disclaimer

Note: Standards in Focus (SIFs) are not intended for use by the Department of Justice PREA auditors to evaluate PREA compliance. SIFs are a tool designed to help agencies and facilities implement, educate, and become familiar with the PREA standards and some related best practices, but are not a compliance checklist. They contain guidance about implementation best practices that may not be required and thus it would not be appropriate for auditors to audit against the SIF. SIFs also do not exhaust implementation guidance for every requirement in every standard.

Notice of Federal Funding and Federal Disclaimer – This project was supported by Grant No. 2019-RP-BX-K001 awarded by the Bureau of Justice Assistance. The Bureau of Justice Assistance is a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the Office for Victims of Crime, and the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking. The opinions, findings, and conclusions or recommendations expressed in this publication/program/exhibition are those of the author(s) and do not necessarily reflect the views of the Department of Justice or grant-making component.

EAST BATON ROUGE PARISH C-778932
Filed May 27, 2026 2:20 PM 27
Deputy Clerk of Court

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Department Regulation**
**No. C-01-022** **10 May 2017**

**FIELD OPERATIONS**
**General**
**Prison Rape Elimination Act (PREA)**

1. **AUTHORITY:** Secretary of the Department of Public Safety and Corrections as contained in Chapter 9 of Title 36; Department of Civil Service Rule No. 12 and the Prison Rape Elimination Act (PREA) of 2003 and Part 115 of Title 28 of the Code of Federal Regulations: Standards for Adult Prisons and Jails.

2. **REFERENCES:** La. R.S. 14:134.1 and 134.2, La. R.S. 15:228.6 and 621 and La. R.S. 44:3 et seq.; Ch.C. Art. 603 and 610; C.Cr.P. Art. 926.1(H)(6); Act No. 276 of the 2015 Regular Session; ACA Standards 4-4084 and 4084-1, 4-4281-1 through 4-4281-8, 4-4371, and 4-4406 (Adult Correctional Institutions); Department Regulation Nos. A-01-011 "Safety Plan," A-01-013 "Forms Management Program," A-02-018 "Institutional Staffing," A-02-022 "Criminal Record Check," A-02-024 "Critical Incident Stress Management Program," A-02-028 "Training and Staff Development," B-05-001 "Disciplinary Rules and Procedures for Adult Offenders," B-02-001 "Assignment and Transfer of Offenders," B-02-020 "Youthful Offenders," B-06-001 "Health Care Manual" (Health Care Policy Nos. 14 "Medical Level of Care" and HC-30 "Sexual Assault"), B-08-010 "Americans with Disabilities Act," B-08-013 "Offender Reentry Program," B-08-018 "Effective Communication with the Hearing Impaired," C-05-001 "Activity Reports/Unusual Occurrence Reports Operational Units" and C-05-003 "Headquarters Compliance Monitoring, etc." and Department Offender Posted Policies (DOPP's) #034 "Maximum Custody Housing-General and #035 "Maximum Custody Housing-Privileges and Restrictions."

3. **PURPOSE**: To prevent, detect, and respond to sexual abuse by staff, volunteers, contractors and offenders within units of the Department of Public Safety and Corrections (DPS&C).

4. **APPLICABILITY:** Deputy Secretary, Undersecretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens, Wardens, Sheriffs and Administrators of transitional work programs under contract to or under cooperative endeavor agreement with the DPS&C, Director of Prison Enterprises, Headquarters Training Director, Department's PREA Coordinator, Department's PREA Investigator, unit staff with responsibility for processing contracts and all other DPS&C Staff. Each Unit Head is responsible for ensuring

Exhibit C

CERTIFIED TRUE AND
CORRECT COPY
JUL 2 0 2026
East Baton Rouge Parish
Deputy Clerk of Court

that appropriate unit written policy and procedures are in place to comply with the provisions of this regulation.

**Note:** This regulation serves to provide guidance and an overview of the required PREA Standards. Each Unit Head shall also be responsible for ensuring complete compliance with all provisions of Part 115 of Title 28 of the Code of Federal Regulations: Standards for Adult Prisons and Jails (copy attached) as outlined in this regulation.

5. **POLICY:** It is the Secretary's policy to provide a safe, humane and appropriately secure environment, free from threat of sexual abuse and sexual harassment for all staff and offenders by maintaining a program of prevention, detection, response, reporting, investigating and tracking of all alleged and substantiated incidents of sexual abuse. The DPS&C shall have zero tolerance for incidents of sexual abuse and sexual harassment within its facilities. (§115.11(A))

6. **DEFINITIONS:**

A. **Abusive Sexual Contact:** Contact without a person's consent or when a person is unable to consent or refuses to consent. The intentional touching, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh or buttocks where the intent to abuse, arouse, or gratify sexual desire. This does not include kicking, grabbing or punching genitals when the intent is to harm or debilitate rather than to sexually exploit.

B. **Aggressor:** A staff member, contractor or offender committing an incident that involves sexual contact that is forced on or against another staff member or offender.

C. **Biological Evidence:** The contents of a sexual assault examination kit or any item that contains blood, semen, hair, saliva, skin tissue, fingerprints, or other identifiable human biological material that may reasonably be used to incriminate or exculpate any person in a criminal investigation, whether that material is catalogued separately on a slide or swab, in a test tube, or some other similar method, or is present on clothing, ligatures, bedding, other household materials, drinking cups, cigarettes or any other item of evidence.

D. **Community Confinement Facility:** A community treatment center, halfway house, restitution center, mental health facility, alcohol or drug rehabilitation center or other community correctional facility (including, a transitional work program (TWP) and residential reentry centers), other than a juvenile facility, in which individuals reside as part of a term of

imprisonment or as a condition of pretrial release or post-release supervision, while participating in gainful employment, employment search efforts, community service, vocational training, treatment, educational programs or similar facility-approved programs during non-residential hours.

E. **Contractor:** An entity that provides services on a recurring basis pursuant to a contractual agreement with the Department to confine offenders. Any new contract or contract renewal following the effective date of this regulation shall include a requirement that the entity is obligated to adopt and comply with the PREA Standards. (§115.12)

F. **Criminal Justice Agency:** Includes any government agency or subunit or private agency that, through statutory authorization or a legal formal agreement with a governmental unit or agency, having the power of investigation, arrest, detention, prosecution, adjudication, treatment, supervision, rehabilitation or release of persons suspected, charged or convicted of a crime, or that collects, stores, processes or disseminates criminal history records or crime information.

G. **Direct Staff Supervision:** Security staff who are present in the same room and within reasonable hearing distance of offenders.

H. **DPS&C Facility:** Includes, for the purpose of this regulation, state operated prison facilities, state privately operated prison facilities and all transitional work programs under contract to or under cooperative endeavor agreement with the DPS&C.

I. **Exigent Circumstances:** Any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility.

J. **Full Compliance:** Conformity with all material requirements of each standard except for *de minimis* violations, or discrete and temporary violations during otherwise sustained periods of compliance.

K. **Gender Nonconforming:** A person whose appearance or manner does not conform to traditional societal gender expectations.

L. **Health Care Practitioner:** Clinicians (such as physicians, dentist, psychologist, podiatrist, optometrists, nurse practitioners, physician assistants and psychiatrists) trained to diagnose and treat patients.

M. **Intersex:** A person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical definitions of male or

female. Intersex medical conditions are sometimes referred to as disorders of sex development.

N. **Investigation Outcome Categories**

1) **Substantiated Allegation:** An allegation that was investigated and the investigation determined the incident to have occurred.

2) **Unfounded Allegation:** An allegation that was investigated and the investigation determined the incident not to have occurred.

3) **Unsubstantiated Allegation:** An allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the incident occurred.

4) **Pending Allegation:** An allegation that was investigated and the outcome of the investigation cannot be decided or settled due to awaiting DNA evidence.

O. **Jail:** A confinement facility of a federal, state, or local law enforcement agency whose primary use is to hold persons pending adjudication of criminal charges, persons committed to confinement after adjudication of criminal charges or persons adjudicated guilty who are awaiting transfer to a correctional facility.

P. **LGBTI:** An acronym for Lesbian, Gay, Bisexual, Transgender, Intersex and Gender Nonconforming offender.

Q. **Lockup:** A facility that contains holding cells, cell blocks or other secure enclosures that are:

1) Under the control of a law enforcement agency, court or custodial officer; and

2) Primarily used for the temporary confinement of individuals who have been arrested, detained, or being transferred to or from a court, jail, prison or other agency.

R. **Mental Health Practitioner:** A mental health professional who, by virtue of education, credentials, and experience, is permitted by law to evaluate and care for patients within the scope of their professional practice. A "qualified mental health practitioner" refers to such a professional who has also successfully completed specialized training for treating sexual abuse victims.

S. **Offender:** Anyone in the physical custody of the DPS&C.

T. **Pat-down Search:** A running of the hands over the clothed body of an offender, detainee or resident by an employee to determine whether the individual possesses contraband.

U. **PREA Blue:** Any offender within the custody of the DPS&C and "Yes" is checked for Item A1 or the offender has four or more points in Section II of the PREA Screening Checklist (Form C-01-022-D).

V. **PREA Red:** Any offender within the custody of the DPS&C and "Yes" is checked for Item A1 or the offender has four or more points in Section III of the PREA Screening Checklist (Form C-01-022-D).

W. **PREA Screening Checklist (Checklist):** An assessment tool utilized to assess an offender's probability of being a PREA Blue High Risk Sexual Victim (HRSV), PREA Red High Risk Sexual Predator (HRSP) or PREA Green.

1) **PREA Blue HRSV:** Based on the Checklist, any offender within the custody of the DPS&C who has been identified as an individual who has been confirmed as a sexual victim or appears to be at high risk for sexual predation.

2) **PREA Red HRSP:** Based on the Checklist, any offender within the custody of the DPS&C who has been identified or confirmed as an individual with the propensity to sexually assault others.

3) **PREA Green:** Based on the Checklist, any offender within the custody of the DPS&C with no significant risk of sexual victimization or sexually predatory behavior.

X. **Prison:** For the purpose of this regulation, any institution under federal or state jurisdiction whose primary use is for the confinement of individuals convicted of a felony.

Y. **Reception and Diagnostic Centers:** Elayn Hunt Correctional Center (EHCC) and the Louisiana Correctional Institute for Women (LCIW) shall serve as the Department's primary reception and diagnostic centers, responsible for reception and diagnostic processing, escapes, apprehensions, extraditions and returns. However, other facilities may also provide reception and diagnostic processing. (See Department Regulation No. B-02-001 "Assignment and Transfer of Offenders" for additional information).

Z. **Repeated:** Regarding sexual harassment, "repeated" for the purpose of a counseling session(s) is more than three complaints. A third alleged sexual harassment complaint against a staff member shall require a formal counseling session with the appropriate supervisor to discuss the complaint.

**Note:** The seriousness of the conduct shall be taken into account in determining the appropriate commensurate response by the unit. Serious sexual harassment complaints, even if committed once, shall still be addressed by the unit. Alleged inappropriate touching of romantic nature, by staff, whether wanted or unwanted, shall be evaluated on a case by case basis to determine if the incident is a violation of PREA.

AA. **Security Staff:** Employees primarily responsible for the supervision and control of offenders in housing units, recreational, dining and other program areas of the facility.

BB. **Sexual Abuse (§115.6):**

1) Sexual abuse of an offender by another offender which includes any of the following acts if the victim does not consent, is coerced into such act by overt or implied threats of violence or is unable to consent or refuse:

a. Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
b. Contact between the mouth and the penis, vulva, or anus;
c. Penetration of the anal or genital opening of another person; and
d. Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of any person, excluding incidents in which the intent of the sexual contact is solely to harm or debilitate rather than to sexually exploit.

2) Sexual abuse of an offender by a staff member, contractor or volunteer which includes any of the following acts, with or without the consent of the offender:

a. Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
b. Contact between the mouth and the penis, vulva, or anus;
c. Contact between the mouth and any body part where the staff member, contractor or volunteer has the intent to abuse, arouse or gratify sexual desire;

d. Penetration of the anal or genital opening, however slight, by a hand, finger, object or other instrument that is unrelated to official duties or where the staff member, contractor or volunteer has the intent to abuse, arouse, or gratify sexual desire;

e. Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh or the buttocks that is unrelated to official duties or where the staff member, contractor or volunteer has the intent to abuse, arouse, or gratify sexual desire;

f. Any attempt, threat, or request by a staff member, contractor or volunteer to engage in the activities described in Subsections 2)a. through e. of this Section;

g. Any display by a staff member, contractor or volunteer of their uncovered genitalia, buttocks or breast in the presence of an offender; and

h. Voyeurism by a staff member, contractor or volunteer:

3) Voyeurism by a staff member, contractor or volunteer: An invasion of an offender's privacy by staff for reasons unrelated to official duties: such as peering at an offender who is using a toilet in their cell to perform bodily functions; requiring an offender to expose their buttocks, genitals or breasts; or taking images of all or part of an offender's naked body or of an offender performing bodily functions, and distributing or publishing them.

4) Sexual harassment includes:

a. Repeated and unwelcome sexual advances, unwanted touching, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one offender directed toward another; and

b. Repeated verbal comments or gestures of a sexual nature to an offender by a staff member, contractor or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing or obscene language or gestures.

CC. **Sexual Assault Collection Kit:** A kit that is designed to assist in the preservation of a human biological specimen or specimens collected during a forensic medical examination from the victim of a criminal sex offense.

DD. **Sexual Assault Forensic Examiners (SAFEs) and Sexual Assault Nurse Examiners (SANEs):** Specially trained and certified examiners

that have specialized training and experience so that they are more sensitive to victim needs and are highly skilled in the collection of evidence, resulting in more successful prosecutions.

EE. **Sexual Misconduct:** A range of behaviors used to obtain sexual gratification against another's will or at the expense of another. Includes sexual harassment, sexual assault and any conduct of a sexual nature that is without consent, or has the effect of threatening or intimidating the person against whom such conduct is directed.

FF. **Staff:** Individuals who are employed by the DPS&C on a full-time, part-time or contractual basis.

GG. **Strip Search:** A search that requires a person to remove all of their clothing so as to permit a visual inspection of the person's breasts, buttocks or genitalia.

HH. **Student Interns:** Students from a credible educational institution who are not paid and allowed to use the classroom knowledge and skills they have obtained in a real world setting.

II. **Transgender:** A person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth.

JJ. **Unit Head:** Refers to the head of an operational unit, specifically the Undersecretary, Wardens, Director of Prison Enterprises and Sheriffs and Administrators local jail facilities and transitional work programs under contract to or under cooperative endeavor agreement with the DPS&C.

KK. **Volunteer:** An individual who donates their time and effort on a recurring basis to enhance the activities and programs of the DPS&C.

LL. **Victim Advocate:** A qualified staff member or a qualified community-based staff member from a rape crisis center who has been screened for appropriateness to serve in the role of a victim's advocate and has received education concerning sexual assault and forensic examination issues in general. (§115.21)

MM. **Vulnerable Adult:** A person 18 years of age or older who is unable to protect himself from abuse, neglect or exploitation due to physical or mental impairment which affects the person's judgment or behavior to the extent that he lacks sufficient understanding or capacity to make, communicate or implement decisions regarding his person.

NN. **Youthful Offender:** Any offender under the age of 18 who is incarcerated in a DPS&C facility.

**7. COORDINATION OF PREA RELATED ISSUES:**

The Secretary shall appoint a staff member to serve as the Department's PREA Coordinator. This position shall also serve as the unit Compliance Manager for Headquarters and Prison Enterprises. The Department's PREA Coordinator shall have oversight of all activities to develop, implement and oversee the Department's efforts to comply with the PREA Standards in all units. (§115.11(B)) In addition, the Secretary shall appoint a staff member to serve as the Department's PREA Investigator. This position shall oversee all investigations for the Department and will work in conjunction with the Unit Heads and unit investigators. See Section 19. "INVESTIGATIONS" regarding the specifics concerning the Department's PREA Investigator's role in PREA investigations.

A. Each Unit Head shall designate an employee to serve as the unit PREA Compliance Manager with sufficient time and authority to coordinate the facility's efforts to comply with the PREA standards. Generally, the employee selected should hold an upper management position. (§115.11(C))

B. Each Unit Head shall submit the names of prospective unit PREA Compliance Managers, along with their position title to the Department's PREA Coordinator. Each submittal shall be reviewed for approval by the Department's PREA Coordinator.

C. The unit PREA Compliance Managers shall serve as a liaison between their facility and the Department's PREA Coordinator and other appropriate Headquarters staff and shall be responsible for monitoring PREA related activities, etc. The unit PREA Compliance Managers shall ensure that each requirement of this regulation, including verification that all training, screening, assessments, reporting and monitoring is accomplished in a timely manner.

**8. STAFFING:**

A. Each facility shall develop and document a staffing plan (see Department Regulation No. A-02-018 "Institutional Staffing) that provides for adequate levels of staffing and, where applicable, video monitoring, to protect offenders against sexual abuse. When designing new units, planning substantial expansions or modifications to existing units or when updating a video monitoring system, the Unit Head shall consider how such

expansions, modifications or updates would enhance the unit's ability to protect offenders from sexual abuse. (§115.18(A) and (B))

B. When calculating adequate staffing levels and determining the need for video monitoring, each unit shall take into consideration the following: (§115.13(A))

1) Generally accepted detention and correctional practices;

2) Any judicial findings of inadequacy;

3) Any finding of inadequacy from Federal investigative agencies;

4) Any findings of inadequacy from internal or external oversight bodies;

5) All components of the unit's physical plant (including "blind spots" or areas where staff or offenders may be isolated);

6) The composition of the offender population;

7) The number and placement of supervisory staff;

8) Institution programs occurring on a particular shift;

9) Any applicable State or local laws, regulations or standards;

10) The prevalence of substantiated and unsubstantiated incidents of sexual abuse;

11) Any other relevant factors.

C. In addition to and along with other rounds as specified in institutional policy, each Unit Head shall ensure policy, post orders, and practice require both intermediate-level or higher-level supervisors conduct and document unannounced rounds for the purpose of identifying and deterring staff sexual abuse and sexual harassment. These rounds shall occur during both night and day shifts. Each unit shall have a policy to prohibit staff from alerting other staff members that these supervisory rounds are occurring, unless such announcement is related to the legitimate operational functions of the unit. (§115.13(D))

D. In circumstances where the staffing plan is not complied with, the Unit Head or designee shall document and justify all deviations from the plan.

This document shall be forwarded to the unit's PREA Compliance Manager for retention purposes. (§115.13(B))

E. Each Unit Head shall develop a PREA staffing plan and annual updates shall be submitted to the Department's PREA Coordinator. The staffing plan shall access, determine and document whether adjustments are needed to the staffing plan, deployment of video monitoring systems or other monitoring technologies and the resources the facility has available to commit to ensure adherence to the staffing plan. (§115.13(A) and (C))

**9. SCREENING, HIRING, DETAIL TO SPECIAL DUTY AND PROMOTION DECISIONS (§115.17):**

A. No unit shall hire, detail or promote any applicant or employee who:

1) Has engaged in sexual abuse in a community confinement facility, jail, lockup or prison as defined in Section 6. of this regulation;

2) Has been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse;

3) Has been civilly or administratively adjudicated to have engaged in the above conduct.

B. In order to comply with the Prison Rape Elimination Act, applicants for hire must allow the Department to contact previous employers from a community confinement facility, jail, lockup or prison (as defined in Section 6. of this regulation). An Authorization to Contact Previous Employers (Form C-01-022-F) shall be completed by all applicants prior to the effective date of hire.

C. Applicants for hire, detail to special duty or direct promotion must truthfully answer all questions included on the PREA Requirements for Applicants and Employees Being Considered for Hire, Detail to Special Duty and/or Promotion (Form C-01-022-G). This form shall be completed by the applicant/employee during the interview process or prior to the effective date of hire.

D. The unit shall consider any incidents of sexual harassment in determining whether to hire, detail or directly promote anyone who may have contact with offenders.

E. Before hiring, detailing or directly promoting any employee who may have contact with offenders each unit shall perform criminal background checks in accordance with Department Regulation A-02-022 "Criminal Record Check." In addition, criminal background checks shall be performed at least once every five years for current employees who may have contact with offenders. (§115.17(E))

F. Prior to hiring any applicant, each unit's Human Resources Office shall contact each applicant's prior community confinement facility, jail, lockup and/or prison employers (as defined in Section 6. of this regulation) for information on substantiated allegations of sexual abuse or any resignation during a pending investigation of an allegation of sexual abuse using the PREA Reference Check (Form C-01-022-H).

G. Each employee has a personal responsibility to disclose to the Unit Head within 72 hours, any conduct for which he was accused, charged and/or convicted as listed in Section 6.A. of this regulation. The PREA Requirements for Applicants and Employees Being Considered for Hire, Detail to Special Duty and/or Promotion (Form C-01-022-G) shall be utilized upon hire for this purpose.

H. Omissions by applicants for hire, detail to special duty or direct promotion regarding such conduct or providing false information about such conduct shall be grounds for disciplinary action up to and including dismissal.

I. Unless prohibited by law, each unit shall provide information regarding substantiated allegations of sexual abuse or sexual harassment involving current or former employees upon receiving a request from a community confinement facility, jail, lockup or prison (as defined in Section 6. of this regulation) for whom such employee has applied to work.

**10. LIMITS TO CROSS-GENDER VIEWING AND SEARCHES (§115.15):**

A. Cross-gender pat-down searches of female offenders are not permitted, absent exigent circumstances.

B. Cross-gender strip searches or cross-gender visual body cavity searches (meaning a search of the anal or genital opening) shall not be conducted except in exigent circumstances.

C. No search or physical exam may be conducted when the sole purpose of the search or physical exam is to determine the offender's genital status. (See Section 14.B. of this regulation for additional information regarding identification of an offender's genital status).

D. Offenders should be allowed to shower, perform bodily functions, and change clothing without non-medical staff of the opposite gender viewing their breasts, buttocks or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. Upon entering a housing unit, all cross-gender staff shall announce their presence.

E. All cross-gender strip searches and cross-gender visual body cavity searches shall be documented on an Unusual Occurrence Report (UOR). (§115.15(C))

**11. TRAINING**

All training on sexual abuse pursuant to the PREA Standards shall be developed by the Department's Training Director in conjunction with the Chief of Operations, Regional Wardens, Department's PREA Coordinator and Department's Medical/Mental Health Director and shall include the following:

A. Employee Training

1) All current staff and new hire employees shall sign the Sexual Assault and Sexual Misconduct with Offenders Acknowledgement (Form C-01-022-A) and the Malfeasance in Office (Form C-01-022-B). Both forms shall be maintained in the employee's personnel file. All staff shall receive instruction related to the prevention, detection, response, reporting and investigation of sexual abuse. (§115.31(D))

2) Training shall be tailored to the gender of the offenders at the employee's facility. The employee shall receive additional training if the employee is reassigned from a facility that houses only male offenders to a facility that houses only female offenders, or vice versa. (§115.15(B))

3) The Department shall provide Correctional Officers with refresher training annually and all other employees shall receive refresher training every two years to ensure that all employees are aware of the Department's current sexual abuse and sexual harassment policies and procedures. (§115.31(C))

4) All security staff shall be trained in how to conduct cross-gender pat-down searches, and searches of transgender and intersex offenders, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs. (§115.15(F))

5) During orientation and annually thereafter, all staff shall be trained in the prevention, detection, response, reporting and investigation of sexual abuse. This training shall include: (§115.31(A) and 115.35(A))

   a. The Department's zero-tolerance policy for sexual abuse and sexual harassment;
   b. How to fulfill the employee's responsibilities pursuant to this Section and this regulation;
   c. An offender's right to be free from sexual abuse and sexual harassment;
   d. The right of offenders and employees to be free from retaliation for reporting sexual abuse and sexual harassment;
   e. The dynamics of sexual abuse and sexual harassment in confinement;
   f. Common reactions of sexual abuse and sexual harassment victims;
   g. How to detect and respond to signs of threatened and actual sexual abuse;
   h. How to avoid inappropriate relationships with offenders;
   i. How to communicate effectively and professionally with offenders, including LGBTI offenders; and
   j. How to comply with relevant laws related to mandatory reporting of sexual abuse to outside authorities. (§115.31(A))

   Training shall also include: (§115.35) Specialized training: Medical and mental health care

   a. The agency shall ensure that all full and part-time medical and mental health care practitioners who work regularly inits facilities have been trained in:

      i. How to detect and assess sign of sexual abuse and sexual harassment;
      ii. How to preserve physical evidence of sexual abuse;
      iii. How to respond effectively and professionally to victims of sexual abuse and sexual harassment; and
      iv. How and to whom to report allegations or suspicions of sexual abuse and sexual harassment.

   b. If medical staff employed by the agency conduct forensic examinations, such medical staff shall receive the appropriate training to conduct such examinations.

c. The agency shall maintain documentation that medical and mental health practitioners have received the training referenced in this standard either from the agency or elsewhere.

d. Medical and mental health care practitioners shall also receive the training mandated for employees under §115.31 or for contractors and volunteers under §115.32, depending upon the practitioner's status at the agency.

B. Volunteer, Intern and Contractor Training (§115.32)

The Department shall ensure that all volunteers, interns and contractors who have contact with offenders have been trained on their responsibilities under the Department's sexual abuse and sexual harassment prevention, detection and response policies and procedures.

1) All volunteers, interns and contractors must sign the Sexual Assault and Sexual Misconduct with Offenders Volunteer Acknowledgement (Form C-01-022-C) stating that they understand that any violation shall result in disbarment from the unit and may include the filing of criminal charges as warranted. Form C-01-022-C shall be maintained in a file under the direct responsibility of the Unit Head or designee.

2) The level and type of training provided to volunteers, interns and contractors shall be based on the services they provide and level of contact they have with offenders, but all volunteers who have contact with offenders shall be notified of the Department's zero tolerance policy regarding sexual abuse and sexual harassment and informed of the procedures to follow to report such incidents.

3) The facility shall maintain documentation confirming the training the volunteers, interns and contractors received.

C. Offender Training (§115.33)

1) Offender orientation for all new incoming offenders shall include verbal and written training information regarding sexual assault and sexual misconduct. This information shall address the following:

- Prevention;
- Self-protection;
- Multiple channels of reporting sexual assault and sexual misconduct;

- Protection from retaliation;
- Treatment and counseling;
- DPS&C zero tolerance for sexual assault and sexual misconduct.

2) Offenders at all institutions shall receive information concerning sexual abuse during offender orientation at their respective permanent housing unit upon intake. In addition, each offender shall receive one hour of annual training regarding sexual abuse and reporting.

D. Offenders with Disabilities and Offenders who are Limited English Proficient

All facilities shall take appropriate steps to ensure that offenders with disabilities (including, for example, offenders who are deaf or hard of hearing, those who are blind or have low vision, those who have intellectual, psychiatric, or speech disabilities), have an equal opportunity to participate in or benefit from all aspects of the Department's efforts to prevent, detect and respond to sexual abuse and sexual harassment. (See Department Regulation Nos. B-08-010 "Americans with Disabilities Act" and B-08-018 "Effective Communication with the Hearing Impaired" for additional information). (§115.15(A) and 115.33(D))

1) The Department shall take reasonable steps to ensure meaningful access to all aspects of the Department's efforts to prevent, detect and respond to sexual abuse and sexual harassment to offenders who are limited English proficient, including steps to provide interpreters who can interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. (§115.16(B))

2) Certified offender interpreters may be used to explain the policies and procedures for reporting; however, the Department shall not rely on offender interpreters, offender readers or other types of offender assistants except in limited circumstances where an extended delay in obtaining an effective interpreter could compromise the offender's safety, the performance of first-response duties (§115.64) or the investigation of the offender's allegations. (§115.16(C))

3) Per the Memorandum of Understanding, the Department will utilize Speak Easy Telephone Interpreting Services for all foreign language interpreting needs.

**12. SCREENING FOR RISK OF VICTIMIZATION AND ABUSIVENESS (§115.41):**

All new incoming offenders shall be screened at the reception and diagnostic centers for a history of predator sexual behavior, sexual abuse and the likelihood/potential of sexual abuse/victimization. Initial intake screening shall occur ordinarily within 24 hours of intake, and requires that the facility reassess the offender's risk of victimization or abusiveness within a set time period, not to exceed 30 days from the offender's arrival at the facility, based upon any additional, relevant information received by the facility subsequent to the intake screening.

A. Reception center staff shall interview and evaluate all incoming offenders for PREA Blue HRSV and/or PREA Red HRSP and/or PREA Green tendencies utilizing the results of the PREA Screening Checklist and Instructions for Utilizing the PREA Screening Checklist (Form C-01-022-D), available offender records and mental health screening. The completed Checklist shall be filed in the offender's Master Record and in the mental health section of the offender's medical record file. Offenders shall not be disciplined for refusing to answer or for not disclosing complete information in response to questions asked in the PREA Screening Checklist.

B. Offenders who enter the Department as sex offenders or offenders identified as PREA Red HRSP by the Checklist shall be advised of the sex offender treatment and programming available by mental health professionals involved in the reception and classification process. Clinical decisions involving these offenders awaiting transfer to a permanent institutional setting shall be the responsibility of the mental health staff at the reception centers.

C. Offenders who enter the Department and are identified as confirmed PREA Blue HRSV victims of sexual assault utilizing the Checklist shall be considered for placement in a permanent institutional setting in accordance with the provisions of Section 16.H.

D. Facility staff shall utilize the Offender Management System High Risk Sexual Predator/Victim Report (Entry Code "CHRSPV 2") to identify offenders that have been screened and identified as PREA Blue or PREA Red and their current housing assignment. PREA Compliance Managers or delegated appropriate staff shall utilize this reporting method to review housing assignments on the first working day of each month in order to verify that PREA Blue and PREA Red are not housed in the same housing area. If the offender's score designates both a PREA Red and PREA Blue, the Warden or designee will determine appropriate housing of the offender.

**13. MEDICAL AND MENTAL HEALTH SCREENINGS/HISTORY OF SEXUAL ABUSE (§115.81):**

A. If the PREA screening indicates that an offender has experienced prior sexual victimization, whether it occurred in an institutional setting or in the community, or that an offender perpetrated sexual abuse, whether it occurred in an institutional setting or in the community, staff shall ensure that the offender is offered a follow-up meeting with a medical or mental health practitioner within 14 days of the intake screening. (§115.81(A) and (B)). The units' Classification Department will complete an Availability of Mental Health Counseling (Form C-01-022-M) upon intake for those offenders with a history of sexual victimization or who have previously perpetrated sexual abuse. This form will then be forwarded to the Mental Health Director for completion and placement into the Mental Health Section of the Medical Record.

B. Any information related to sexual victimization or abusiveness that occurred in an institutional setting shall be limited to treatment staff (and others as necessary) in order to develop treatment plans and security and management decisions, including housing, bed, work, education and program assignments, or as otherwise required by Federal, State or local law. (§115.81(D))

C. Medical and mental health practitioners shall obtain informed consent from offenders before reporting information regarding prior sexual victimization that did not occur in an institutional setting, unless the offender is under the age of 18. (§115.81(E))

**14. USE OF SCREENING INFORMATION UPON INITIAL INTAKE:**

A. Decisions concerning housing assignments, jobs and group activities for PREA Blue HRSV and PREA Red HRSP offenders shall be the responsibility of the Initial Classification Board at each receiving institution and shall be based on the Checklist, record review, prior facility behavior and current behavior. If mental health intervention is indicated, a referral shall be made by the Initial Board to a mental health professional. Offenders may not be disciplined for refusing to answer, or for not disclosing complete information in response to questions which are contained on the PREA Screening Checklist. (§115.41 (d)(1), (d)(7), (d)(8) or (d)(9))

B. In deciding whether to assign a transgender or intersex offender to a facility for male or female offenders, and in making other housing and programming assignments, the unit shall consider on a case-by-case basis whether a placement would ensure the offender's health and safety,

and whether the placement would present management or security problems. Transgender offenders will also be given the opportunity to shower separately and each unit shall maintain documentation of the efforts to offer separate showers utilizing a Shower Preference Statement (Form C-01-022-N). Questions regarding identification of a transgender or intersex offender's genital status shall be referred to the Department's Medical/Mental Health Director for review and, if needed, determination if a physical examination in a private setting by a health care provider is necessary. (§115.15(E) and 115.42(C))

C. Reception center staff shall note the results of the Checklist in the Offender Management System. Consideration concerning housing, including possible single cell, shall be determined by the Classification Board based on initial screening information for those offenders confirmed/deemed PREA Blue HRSV and/or PREA Red HRSP.

**15. YOUTHFUL OFFENDERS** (§115.14)**:**

A. All offenders under the age of 18 years housed in a state correctional facility are considered youthful offenders.

B. The Department recognizes that:

1) No youthful offender may be placed in a housing unit in which the offender will have contact with any adult offender through use of a shared day room or other common space, shower area or sleeping quarters;

2) Outside of housing units, the Department shall either maintain "sight and sound separation" between youthful offenders and adult offenders to prevent adult offenders from seeing or communicating with youthful offenders, or provide direct staff supervision when youthful offenders and adult offenders are together.

C. Administrative staff shall make their best efforts to avoid placing youthful offenders in segregation to comply with the provisions of this Section and that, absent exigent circumstances, each unit shall comply with this standard in a manner that affords youthful offenders daily large-muscle exercise and any legally required special education. Youthful offenders shall also have access to other programs and work opportunities to the extent possible.

D. Refer to Department Regulation No. B-02-020 "Youthful Offenders" for additional information specific to this offender population.

**16. USE OF SCREENING INFORMATION AT PERMANENT HOUSING ASSIGNMENT (§115.42):**

The completed Checklist for all offenders at their permanent housing assignment shall be filed and shall remain in the offender's Master Record and in the mental health section of the offender's medical record file. The Checklist shall not be considered a public record.

A. Once an offender is confirmed/deemed a PREA Blue HRSV and/or PREA Red HRSP at any time during incarceration, the offender shall be evaluated by the Classification Board for appropriate housing and programs and the offender shall be referred to a mental health professional. The mental health professional shall meet with the offender upon receipt of the referral to offer services and encourage programming.

B. Placement and programming assignments for transgender or intersex offenders shall be reassessed and documented at least twice each year utilizing the Transgender/Intersex Reassessment (Form C-01-022-O) by Classification staff to review any threats to safety experienced by the offender.

**Note:** It is prohibited to place a lesbian, gay, bisexual, transgender, intersex and gender nonconforming offender (LGBTI) in a dedicated unit or facility solely on the basis of LGBTI identification unless such placement is pursuant to a legal requirement for the purpose of protecting such an offender. Transgender and intersex offenders must be given the opportunity to shower separately from other offenders.

C. The Department's Medical/Mental Health Director shall ensure that the institution employs or has access to the services of a licensed mental health professional that has a scope of practice, training and/or experience in trauma counseling.

D Mental health services for PREA Blue HRSV offenders shall focus on issues related to treatment for and prevention of victimization.

E. Mental health services for PREA Red HRSP offenders shall focus on alleviating the offender's propensity for predatory or aggressive sexual behavior.

F. The Director of Classification or designee at each institution shall be notified at intake by the Initial Board or by any staff member thereafter who identifies an offender as a PREA Blue HRSV and/or PREA Red HRSP. The Director of Classification or designee shall ensure that this information is entered into the offender's Annual Assessment, Master Record and in

the mental health section of the offender's medical record for monitoring purposes. If the offender's discharge date occurs prior to the Annual Assessment, a screening shall be completed prior to discharge. Each facility will be responsible for reviewing an offender's PREA designation prior to any housing, job or program reassignment to make an individualized determination regarding how to ensure the safety of each offender.

G. At least quarterly, Unit Managers shall ensure housing area supervisors and staff are provided with information identifying which offenders within those housing locations are designated as PREA Blue HRSV and PREA Red HRSP in order to achieve the effective management of these offender populations. Additionally, this information shall be provided to housing area supervisors each time a PREA Blue HRSV or PREA Red HRSP offender's housing location is changed.

H. Offenders at high risk for sexual victimization shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers. If the facility restricts access to programs, privileges, education or work opportunities, the facility shall document this information on the 24 Hour Review of Involuntary Segregation Status during PREA-Related Investigations (Form C-01-022-P). If a facility cannot conduct an assessment immediately, the facility may hold the offender in involuntary segregated housing for less than 24 hours while completing the assessment. (§115.43)

I. Any offender who is recognized by staff or others as displaying predatory behavior or the potential for victimization shall be referred to the PREA Compliance Manager for a special referral evaluation utilizing the Checklist to determine the appropriate classification for the offender. If indicated, the Compliance Manager shall ensure that a referral is made to a mental health professional for intervention.

**17. REPORTING WITHIN THE DEPARTMENT:**

A. An allegation of sexual abuse shall be reported to the Department's PREA Coordinator and the Department's PREA Investigator immediately following the initial notification to the Unit Head. Such allegations shall be treated with discretion and confidentiality.

B. All allegations of sexual assault, sexual misconduct or sexual harassment by either staff or offender may be reported to any staff member. The staff member who receives such reports whether verbally or in writing, shall

immediately notify their supervisor who shall ensure that an Unusual Occurrence Report (UOR) is completed. Unit policy and procedures shall include specific methods for staff to also privately report sexual assault or sexual misconduct of offenders to any staff member. All PREA related UOR's shall be forwarded immediately up the chain of command. The appropriate supervisor shall immediately contact the facility investigative section. Staff shall also report any claims of retaliation against offenders and staff for reporting abuse, as well as any staff neglect or violation of responsibility that may have contributed to an incident or retaliation. For at least 90 days following a report of sexual abuse, the unit shall monitor the conduct and treatment of offenders or staff who reported the sexual abuse and offenders who were reported to have suffered sexual abuse to determine if there are changes that may suggest possible retaliation by offenders or staff and shall act promptly to remedy any such retaliation. Items the unit should monitor include any offender disciplinary reports, housing or program changes, or negative performance reviews or reassignments of staff. The unit shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need. This should be documented on the PREA Agency Protection against Retaliation for Offenders/Staff (Form C-01-022-Q). In the event an offender who is being monitored for retaliation is transferred, the PREA Compliance Manager at the sending facility shall follow up with the receiving facility to ensure continuity of retaliation monitoring. (§115.61(A), 115.51(C) and (D) and 115.67 (A) and (E)). An agency's obligation to monitor shall terminate if the agency determines that the allegation is unfounded.

C. An offender may also use the Administrative Remedy Procedure (ARP) as a means to report an alleged sexual assault or sexual misconduct. There is no time limit imposed regarding when an offender may submit a grievance regarding an allegation of sexual abuse. The Department shall not require an offender to use any informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse. Nothing in this section shall restrict the unit's ability to defend against an offender's lawsuit on the ground that the applicable statute of limitations has expired. (§115.52)

Third parties (which may include other offenders, unit staff, family members, attorneys and outside advocates) may also assist offenders by making sexual abuse harassment reports, and/or initiating formal grievances. However, once this formal grievance process has been initiated by a third party, the offender must authorize the request for remedy and must continue the process in accordance with Department Regulation No. B-05-005 "Administrative Remedy Procedure." The unit shall document offenders who decline to continue with the grievance once a third party initiates the process.

D. In every case where the alleged aggressor is a staff member, there shall be no contact between the alleged aggressor and the alleged offender/victim without the approval of the Unit Head.

E. The staff member receiving the report and/or the appropriate supervisor shall advise the victim not to shower or otherwise hygienically clean or if the assault was oral, not to eat, drink, or brush the teeth or otherwise take any action that could damage or destroy physical evidence pending completion of the gathering of that evidence and/or the initial investigation.

F. If the alleged assault has occurred within the previous 72 hours and evidence is obtainable or other circumstances dictate, arrangements shall immediately be made to have the alleged victim escorted under appropriate security provisions to the infirmary for assessment. Testing for pregnancy, sexually transmitted diseases (HIV, gonorrhea, hepatitis etc.) and other diseases as determined by the attending physician and counseling shall be made available to the alleged victim when appropriate.

G. The Department shall offer all victims of sexual abuse access to forensic medical examinations, whether on-site or at an outside facility, without financial cost to the victim, when evidentiary or medically appropriate. Such examinations shall be performed by Sexual Assault Forensic Examiners (SAFEs) or Sexual Assault Nurse Examiners (SANEs) where possible. If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified medical practitioners. The Department shall document its efforts to provide SAFEs and SANEs. (§115.21(C))

H. The assigned investigator shall immediately notify the Victim Advocate (but no later than the next business day), that an alleged sexual abuse has occurred. (§115.21(D))

1) The Victim Advocate shall consult with the assigned investigator and offer assistance to the alleged victim as is appropriate.

2) As requested by the victim and with the alleged victim's written consent utilizing the Consent for Victim Advocate (Form C-01-022-I), the Victim Advocate may participate in supporting victims throughout the forensic medical examination process (ensuring compliance in confidentiality laws) and investigatory interviews and shall provide emotional support, crisis intervention, information and referrals. (§115.21(E))

3) The Victim Advocate may not obstruct or interfere with the course of the investigation in any manner.

4) All conversations between the Victim Advocate and the alleged victim shall remain confidential except when:

   a. Disclosure of the confidential information is necessary to protect the victim or another (staff or offender) from potential harm; or
   b. The identity of an otherwise unknown alleged sexual predator is revealed.

5) The Victim Advocate shall not prepare or submit an Unusual Occurrence Report based upon conversations or functions performed while in the role of Victim Advocate.

I. If the alleged victim is a youthful offender (or is considered a vulnerable adult), the reporting requirements outlined in this Section shall be followed. (§115.61(D) and 115.21(B))

1) The unit PREA Compliance Manager shall complete the Department of Children and Family Services/Child Welfare Report for Mandated Reporters of Child Abuse/Neglect (Form C-01-022-J) and e-mail a copy of the report to the Department's PREA Investigator and the Department's PREA Coordinator within 24 hours of the allegation or incident. Within this 24 hour period, the unit PREA Compliance Manager shall also make an oral report of the allegation or incident to the Department of Family Services by calling 1-855-452-5437 or, in the case of vulnerable adults, the appropriate law enforcement agency.

2) Following review and concurrence with the report by the Department's PREA Coordinator and Department's PREA Investigator, the unit PREA Compliance Manager shall fax a copy of the report (Form C-01-022-J) to the Department of Family Services at the appropriate fax number listed below. For convenience, telephone numbers are also included.

| Facility | Fax No. | Telephone No. |
|---|---|---|
| AVC | 318-253-5053 | 318-253-7734 |
| ALC, WNC | 337-639-4052 | 337-639-2963 |
| DCI, LSP | 225-683-9634 | 225-683-3734 |
| DWCC | 318-371-3083 | 318-371-3004 |
| EHCC, LCIW | 225-687-2129 | 225-687-4373 |
| RCC | 985-732-6826 | 985-732-6800 |

3) Mandatory reporters of sexual abuse of a youthful offender include health practitioners, mental health/social service practitioners, clergy, teachers and law enforcement officers. Failure to report sexual abuse of a youthful offender or a vulnerable adult by a mandatory reporter may result in disciplinary action taken by the Department and the individual's professional licensing board.

4) Submission of Form C-01-022-J as stated in Sections 17.I.1) and 2) shall be in addition to and prior to the completion of the mandatory PREA investigation.

5) Form C-01-022-J shall be maintained in the investigative file of the incident and a copy shall be maintained in the youthful offender's mental health file.

**18. REPORTING TO OTHER CONFINEMENT FACILITIES (§115.63):**

Upon receiving an allegation that an offender was sexually abused while confined at another facility, the Unit Head or designee of the facility that received the allegation shall notify in writing the Unit Head of the facility or designee where the alleged abuse occurred. Notification shall be provided as soon as possible, but no later than 72 hours after receiving the allegation and documentation shall be placed in the offender's Master Record

**19. REPORTING TO EXTERNAL AGENCIES:**

A. Reporting to the Louisiana Commission on Law Enforcement and the Administration of Criminal Justice

1) By February 15th of each year, the Department's PREA Investigator shall report all of the following information for the prior calendar year to the Louisiana Commission on Law Enforcement and the Administration of Criminal Justice:

2) The number of sexually-oriented criminal offenses reported;

3) The status of each sexually-oriented criminal offense case reported;

4) The number of sexual assault collection kits submitted for analysis;

5) The number of reported sexual assault collection kits requiring analysis;

6) The number of reported sexual assault collection kits received;

7) The number of unreported sexual assault collection kits that were untested due to judicial or investigative reasons.

8) The report shall also provide written notification if it does not have:

   a. Any sexually-oriented criminal offenses reported;
   b. Any reported sexual assault collection kits in the Department's possession;
   c. Any unreported sexual assault collection kits in the Department's possession.

B. Reporting to the United States Department of Justice

1) The Department's PREA Investigator shall prepare the annual Survey of Sexual Victimization for State Prison Systems (SSV-2) report. The official SSV-2 contains statistics for DPS&C owned and operated facilities.

2) A separate Incident Form (Adult, SSV-1A) shall be prepared for each substantiated sexual victimization allegation reported at a Department facility. The SSV-1A shall be created by the PREA Investigator at the facility where the incident occurred. The PREA Investigator shall submit the SSV-1A to the Department's PREA Investigator who shall ensure the accurate completion of each incident form and retain the SSV-1A.

3) The SSV-2 and all SSV-1A forms shall be submitted by the Department's PREA Investigator to the United States Department of Justice by September 1st of each year for the statistics accumulated the prior calendar year.

4) A second SSV-2 report shall be completed by the Department's PREA Investigator which shall include any and all state privately operated prisons and all transitional work programs under contract to or under cooperative endeavor agreement with the DPS&C.

5) The Department's PREA Investigator shall also maintain any SSV-1A reports concerning a substantiated sexual victimization allegation occurring at all state privately operated prisons and all transitional work programs under contract to or under cooperative endeavor agreement with the DPS&C.

6) The Department's PREA Investigator shall submit copies of both SSV-2 reports to the Secretary and the Chief of Operations prior to September 1st of each year.

7) The aggregate numbers of the SSV-2 reports which includes statistics from the state operated prison facilities, state privately operated prison facilities and all transitional work programs under contract to or under cooperative endeavor agreement with the DPS&C shall be posted on the Department's website by October 1st of each year. The Department shall maintain sexual abuse data collected pursuant to La. R.S. 115.87 for at least 10 years after the date of initial collection.

**Note:** All external reports are confidential and exempt from the Louisiana Public Records Act (La. R.S. 44:3 et seq.)

**20. INVESTIGATIONS (§115.71):**

**Note:** When sexual abuse is alleged, the unit shall use investigators who have received special training in investigating incidents of sexual assault and sexual misconduct. This training may include, but not be limited to: sexual abuse investigations; crime scene management; elimination of contamination; evidence collection protocol and crisis intervention. (§115.34(A))

A. Investigation of recent sexual assault or sexual misconduct occurring within 72 hours: If the alleged sexual assault or sexual misconduct is reported or discovered within 72 hours of the incident, the following steps shall be taken by the Unit Head or designee. (§115.21(A) and 115.64)

1) The Unit Head shall be notified and an investigation shall be initiated as directed. Based upon the initial inquiry and/or evidence that the allegation represents possible criminal activity, the Unit Head or designee shall notify local law enforcement and the facility investigative section.

2) If the alleged aggressor is known to be an offender, he shall be placed in segregation pending investigation.

3) At the initiation of the investigation, alleged victim(s) and alleged aggressor(s) shall be immediately separated.

**Note:** The Unit Head, designee or unit PREA Compliance Manager shall coordinate with the assigned investigator in making decisions regarding the housing and management of the alleged offender/victim(s), the alleged offender/ aggressor(s) and any alleged offender/witness(es) so as not to inadvertently interfere with the criminal investigation.

4) Secure the alleged crime scene if feasible and if forensic evidence is likely to exist.

5) A log shall be maintained to record the name of each person entering the crime scene, the time of entry and time of departure.

6) The only persons allowed to enter a secured crime scene are the assigned investigator(s), medical staff and/or the Unit Head, as needed.

7) The crime scene shall remain secured until released by the investigator.

8) Investigators shall: gather and preserve direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data; interview alleged victims, suspected perpetrators, and witnesses; and shall review prior complaints and reports of sexual abuse involving the suspected perpetrator.

9) In accordance with La. R.S. 15:621, all biological evidence collected in cases involving homicide and rape shall be held in secure custody indefinitely or turned over to the Sheriff's Office that is handling the criminal investigation. In either case, the biological evidence shall not be destroyed and shall be stored appropriately. This does not preclude removing parts containing biological evidence from large items of evidence and retaining only the parts containing the biological evidence.
**Note:** All unit PREA Compliance Managers or investigators shall notify the Department's PREA Investigator via e-mail before any sexual assault kits involving staff DNA are submitted to the Louisiana State Police Crime Lab for investigative purposes.

10) The alleged victim shall be promptly escorted under appropriate security provisions to the infirmary for assessment.

11) In preparation for transporting the alleged victim to the infirmary or hospital emergency room, the victim shall be instructed to undress over a clean sheet in order to collect any potential forensic evidence that may fall from his person. The sheet, along with the victim's clothing, shall be collected as evidence and placed in a paper bag with an appropriate chain of evidence form attached. Appropriate substitute clothing shall be provided to the victim.

12) When the alleged victim is an offender and is released from the infirmary or emergency room, the alleged offender/victim shall be

segregated from the alleged aggressor and screened by a mental health professional and appropriate referrals are made.

13) Separate interviews of the alleged victim and the alleged aggressor shall be conducted.

14) No facility shall require an offender who alleges sexual abuse to submit to a polygraph examination or other truth-telling device as a condition for proceeding with the investigation of such an allegation.

15) The credibility of an alleged victim, suspect or witness shall be assessed on an individual basis and shall not be determined by the person's status as detainee or staff.

16) Alleged aggressors who are offenders shall be held in segregation pending investigation and shall remain there until the investigation is complete, unless other circumstances require the transfer of the alleged offender aggressor. The offender accused of the predatory behavior shall be evaluated by mental health staff prior to the disciplinary hearing of the violation.

17) All facilities shall attempt to conduct a mental health evaluation of all known offender on offender abusers within 60 days of learning of such abuse history and after treatment when deemed appropriate by mental health practitioners. This shall be documented utilizing the Mental Health Evaluation for Substantiated Cases of Sexual Assault (Form C-01-022-R).

B. Investigations of sexual abuse occurring more than 72 hours after the incident: The following steps shall be taken by the Unit Head or designee.

1) Alleged victim(s) and alleged aggressor(s) shall be immediately separated and assigned to an appropriate housing unit.

2) Medical and mental health screening shall be offered to all victims.

3) A determination shall be made based upon the amount of time that has passed since the alleged incident occurred and the possibility of evidence still existing, as to whether the alleged aggressor, if known to be an offender, should be placed in a dry cell to preserve forensic evidence. An offender who is placed in a dry cell for purposes of preserving forensic evidence shall be strip-searched, issued a paper gown and will have all possessions removed. No offender placed in a dry cell shall remain in such status any longer

than is necessary to determine if any forensic or other evidence can be obtained.

4) A determination shall be made based upon the amount of time that has passed since the alleged incident and other factors, whether there is a possibility of evidence still existing at the crime scene. If it is determined that evidence may still exist, the alleged crime scene shall be secured and any potential evidence shall remain in place for the investigation. If the alleged crime scene cannot be secured, it shall be photographed and/or videotaped and proper evidence protocols followed.

5) Investigators shall: gather and preserve direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data; interview alleged victims, suspected perpetrators, and witnesses; and review prior complaints and reports of sexual abuse involving the suspected perpetrator.

6) All PREA investigations shall result in a formal report utilizing the Standardized Case Report (Form C-01-022-E). Standardized case reporting shall be conducted as follows.

a. A case report numbering format shall be utilized:

i. Three letter facility identifier;
ii. Two digit year identifier;
iii. Single letter month identifier, with January beginning "A";
iv. A sequential case number example: The case report number for Rayburn Correctional Center assigning the first case of January, 2012 would be: RCC-12-A-001.

b. All PREA investigation case reports shall be reviewed and approved by the Warden or designated Deputy Warden. Upon unit review and approval, all PREA investigation case reports shall be forwarded to the Department's PREA Investigator for final review, approval/disapproval and disposition.

7) All investigation case reports shall be concluded, reviewed and forwarded to Headquarters within 30 days of receiving the initial allegation. In the event an extension of the 30-day time period is needed, a request shall be submitted to the Headquarters Director of Investigations who shall approve or deny the request.

8) Investigations concerning allegations of employees holding the rank of Colonel or above shall be conducted by investigators assigned by the Department's PREA Investigator. Following an investigation regarding an offender's allegation of sexual abuse, the unit shall inform the offender if the allegation was determined to be substantiated, unsubstantiated or unfounded. (§115.73(A))

C. Investigations of Potential Criminal Allegations

Incidents involving criminal acts of sexual assault and sexual misconduct where local law enforcement is not conducting the investigation should be investigated by an investigator who is acting under the authority of the Department's PREA Investigator. If such an investigator is not assigned to the reporting unit, one shall be assigned to the facility by the Chief of Operations.

D. Notifications

1) Following the conclusion of an investigation into an offender's allegation that the offender suffered sexual abuse, the unit shall inform the offender as to whether the allegation was determined to be substantiated, unsubstantiated or unfounded.

2) If the unit did not conduct the investigation, it shall request the relevant information from the investigative entity in order to inform the offender of the investigative findings.

3) Following an offender's allegation that a staff member has committed sexual abuse against the offender, the unit shall subsequently inform the offender (unless the unit has determined that the allegation is unfounded) whenever:

a. The staff member is no longer posted within the offender's unit;
b. The staff member is no longer employed at the unit;
c. The unit learns that the staff member has been indicted on a charge related to sexual abuse within the unit; or
d. The unit learns that the staff member has been convicted on a charge related to abuse within the unit.

4) Following an offender's allegation of sexual abuse by another offender, the unit shall subsequently inform the alleged victim whenever:

a. The unit learns that the alleged abuser has been indicted on a charge related to sexual abuse within the unit; or
b. The unit learns that the alleged abuser has been convicted on a charge related to sexual abuse within the unit.

5) All notifications or attempted notifications shall be documented utilizing the Notification of Outcome of PREA Allegation (Form C-01-022-S).

6) A unit's obligation to report pursuant to this Section shall terminate when the offender achieves a full term release date.

**21. DATA COLLECTION AND PROSECUTION:**

A. Data Collection

1) The PREA Allegation Database, accessed in Lotus Notes, is the electronic data collection system which tracks all allegations of sexual abuse defined by this regulation.

2) Allegations shall be input into the Database by authorized staff (approved by the Chief of Operations or designee) who shall track the investigations of all allegations of sexual assault and sexual misconduct.

3) The incident-based data collected shall include, at a minimum, the data necessary to answer all questions from the most recent version of the Survey of Sexual Violence conducted by the Department of Justice's Bureau of Justice Statistics. (§115.87)

B. Prosecution

1) Substantiated allegations shall be forwarded to the local District Attorney for a decision regarding prosecution. (§115.71(h)) Administrative disciplinary action should be initiated on the aggressor (offender or staff). The unit PREA Investigator shall work with the District Attorney's Office to ensure appropriate criminal prosecution of substantiated cases of sexual assault. Each facility shall request the outside investigative entity to abide by PREA standards and shall maintain documentation of the request. (§115.22(B))

2) The PREA Allegation Database shall be updated by authorized staff to reflect the District Attorney's actions concerning PREA cases.

**22. SEXUAL ABUSE INCIDENT REVIEWS (§115.86):**

The unit shall conduct a sexual abuse incident review at the conclusion of every sexual abuse investigation, including substantiated cases, as well as unsubstantiated cases, unless the allegation has been determined to be unfounded. The review shall ordinarily occur within 30 days of the conclusion of the investigation. The review team shall include upper management officials, (Deputy Warden, or Assistant Warden(s) and unit PREA Compliance Manager, etc.) with input from line supervisors, investigators and medical or mental health practitioners. The review team shall prepare a Sexual Abuse Incident Review (Form C-01-022-K) pursuant to Paragraphs (1) through (6) of §115.86. The completed Sexual Abuse Incident Review (Form C-01-022-K) shall be maintained in the investigative file of the incident and a copy shall be sent to the Unit Head and the unit PREA Compliance Manager.

**23. DISCIPLINARY ACTION:**

A. The Department has adopted a zero tolerance policy toward victimization and sexual abuse within our facilities through the PREA Program. It is imperative that all Department personnel take appropriate actions to properly document and investigate allegations of sexual assault, sexual misconduct, sexual harassment and sexual coercion. Full investigations, appropriate reporting and compliance to the standards program are crucial to the success of the program and will be treated as a top priority by administrators and investigators. (§115.22(A))

B. Staff that violate this regulation may receive disciplinary action, up to and including termination. Appropriate steps shall be taken to ensure fairness and due process.

**24. DATA PUBLICATION (§115.89):**

The Department's PREA Coordinator shall make an annual report regarding all sexual abuse data from DPS&C facilities available to the public through the Department's website (www.doc.la.gov). The report shall consist of numbers only and shall not include personal identifiers or specific institutions.

s/James M. Le Blanc
Secretary

Attachment: Part 115 of Title 28 of the Code of Federal Regulations: Standards for Adult Prisons and Jails

Forms:

| | |
|---|---|
| C-01-022-A | Sexual Assault and Sexual Misconduct with Offenders Acknowledgement |
| C-01-022-B | Malfeasance in Office |
| C-01-022-C | Sexual Assault and Sexual Misconduct with Offenders Volunteer Acknowledgement |
| C-01-022-D | PREA Screening Checklist and Instructions for Utilizing the PREA Screening Checklist |
| C-01-022-E | Standardized Case Report |
| C-01-022-F | Authorization to Contact Previous Employers |
| C-01-022-G | PREA Requirements for Applicants and Employees Being Considered for Hire, Detail to Special Duty and/or Promotion |
| C-01-022-H | PREA Reference Check |
| C-01-022-I | Consent for Victim Advocate |
| C-01-022-J | Department of Children and Family Services/Child Welfare Written Report for Mandated Reporters of Child Abuse/Neglect |
| C-01-022-K | Sexual Abuse Incident Review |
| C-01-022-L | PREA Vulnerability Reassessment Questionnaire |
| C-01-022-M | Availability of Mental Health Counseling |
| C-01-022-N | Shower Preference Statement |
| C-01-022-O | Transgender/Intersex Reassessment |
| C-01-022-P | 24 Hour Review of Involuntary Segregation Status during PREA-Related Investigations |
| C-01-022-Q | PREA Agency Protection against Retaliation for Offenders/Staff |
| C-01-022-R | Mental Health Evaluation for Substantiated Cases of Sexual Assault |
| C-01-022-S | Notification of Outcome of PREA Allegation |

This regulation supersedes Department Regulation No. C-01-022 dated 22 November 2016.

EAST BATON ROUGE PARISH C-778932
Filed Jun 24, 2026 11:48 AM 27
Deputy Clerk of Court

778932

To: 19th Judicial district court

Parish of East Baton Rouge

State of Louisiana

ATTN: Clerk of court civil department

300 North Boulevard Suite 3301

Baton Rouge, La

From: Keyana Nash

1514 Weems Ave

Lecompte, la 71346

**DEFENDANT RESPONSE TO PETITION**

I, **Keyana Nash**, submit the following response regarding the allegations made against me by J.O. I firmly deny the allegations presented in this petition and maintain that the statements made by J.O. are false. I intend to present evidence proving that the allegations against me are untrue. Below is my response to each section of the petition.

Page 1 – Paragraph 1(A)

My name is **Keyana Nash**. I was employed by the **Office of Juvenile Justice (OJJ)** at **Acadiana Center for Youth (ACY)** from approximately **October 2024 until May 12, 2025.**

Paragraphs 2 and 3

I deny responsibility and liability for the allegations presented under Louisiana Civil Code Article 2315 regarding sexual battery, sexual assault, and intentional infliction of emotional distress. I did not commit any of the alleged acts.

FACTUAL ALLEGATIONS

Paragraph 4

J.O. was adjudicated at Acadiana Center for Youth in Bunkie, Louisiana while I was employed there between October 2024 and May 2025. During my employment, I had no inappropriate interactions with J.O. outside of routine staff duties, including redirections and disciplinary write-ups related to smoking violations. No sexual misconduct ever occurred between myself and J.O.

CERTIFIED TRUE AND CORRECT COPY
JUL 29 2026
East Baton Rouge Parish
Deputy Clerk of Court

Paragraph 5

During this time, I worked as a Juvenile Justice Specialist (JJS) at the facility where J.O. was housed with approximately 71 other youths. Staff were assigned to specific units each workday. I was considered a dependable staff member and had been instructed to help identify the source of contraband entering the unit.

Paragraph 6

I never had any sexual interest in J.O. We never communicated by phone and had minimal interaction during my shifts. I worked day shift from 6:00 a.m. to 6:00 p.m. Youth attended school until approximately 3:00 p.m., followed by group activities from 4:00 p.m. to 5:00 p.m., after which showers were permitted only after approval from the group leader. If J.O. was awake outside of those activities, he was often either sleeping or smoking. Facility camera footage can verify this.

Paragraph 7

I never engaged in sexual intercourse or sexual activity with any youth at Acadiana Center for Youth. There is an area known as "the cut," where youths would sometimes go to fight, requiring staff intervention. Cameras monitor the dorm areas. Staff members were rarely alone and consistently worked together for safety purposes.

Paragraph 8

Staff members were prohibited from unnecessary physical proximity with youths. Whenever youths needed to use the restroom, I ensured I remained visible on camera. I never forced J.O. to grope me, sit next to me, or engage in any sexual conduct. J.O. himself had previously engaged in inappropriate sexual behavior by masturbating in view of female staff members.

Paragraph 9

I never participated in any scheme to keep J.O. adjudicated beyond proper protocol. I rarely wrote disciplinary reports regarding J.O. Most write-ups involved prohibited smoking violations. I believe J.O. provided false statements and adopted allegations that were not truthful.

Paragraph 10

I never told J.O. that he would remain detained unless he engaged in sexual acts with me. As a JJS 1 employee, I was not authorized to carry mace. Only supervisors were permitted to do so. I did not touch any youth in a sexual manner.

Paragraph 11

J.O. falsely claimed he contacted the PREA hotline and that it was nonfunctional. Facility phones were routinely checked twice daily to ensure proper operation.

Paragraph 12

I deny the allegations in this paragraph. The alleged events did not occur.

Paragraph 13

Any knowledge referenced by others regarding these allegations would constitute hearsay rather than firsthand knowledge.

Mandatory Reporting

Paragraph 14

This section does not apply to me because I did not sexually abuse anyone at the facility.

Paragraph 15

In April 2025, I was sent by staff from Bulldogs Unit to retrieve a book, despite being assigned to Cajuns Unit. Another youth requested that I retrieve the book from Lions Unit. Upon opening the book, I discovered contraband substances known as "Mojo" and observed three youths' names written inside, including J.O.'s. I immediately reported and turned over the evidence.

In the following days, the youth supplying the contraband was transferred out of the facility. J.O. became upset and told me words to the effect that I would lose my job because I did not comply with what he wanted. He stated he would file complaints and report me. I documented this incident in an Unusual Occurrence Report (UOR).

Paragraph 16

I cannot verify the accuracy or completeness of Ms. La Fountain's reporting.

Paragraph 17

On May 12, 2025, I was arrested regarding allegations of sexual misconduct. However, documents provided through discovery in that criminal matter identify allegations made by another youth, not J.O. That fact is documented.

Paragraph 18

I did not engage in sexual activity with any youth.

Paragraph 19

My official title at the facility was Juvenile Justice Specialist, not correctional guard.

Paragraph 20

I did not violate any constitutional rights as alleged.

Paragraph 21

I never abused my authority while employed at the Acadiana Center for Youth.

Paragraph 22

I never forced J.O. to perform sexual acts.

Paragraph 23

Youth residents are allowed journals and may write stories, opinions, personal writings, or fictional content.

PREA Allegations

Paragraph 24

This allegation does not apply to me.

Paragraph 25

No sexual abuse occurred.

Paragraph 26

I did not engage in any conduct prohibited under PREA.

Paragraph 27

My arrest involved the same criminal charge, but not allegations made by J.O.

Paragraph 28

This allegation is entirely false. No rape occurred. I did not participate in any sexual misconduct involving J.O.

Paragraph 29

There was no violation of the Eighth or Fourteenth Amendments.

Paragraph 30

I did not commit rape or sexual abuse against any youth at Acadiana Center for Youth.

Paragraph 31

This allegation does not apply to me.

Paragraph 32

I believe J.O. adopted allegations from another source in an effort to manipulate circumstances related to his custody status. I was not arrested based upon allegations made by J.O. These false accusations have caused significant emotional distress.

Paragraph 33

I request that J.O. be responsible for his own attorney fees.

Paragraph 34

The false allegations made against me have been reckless and damaging to my reputation and character.

Paragraph 35

I did not coerce or force J.O. or anyone else into any sexual conduct.

Paragraph 37

I did not rape J.O. I did not engage in any inappropriate communication, physical contact, or behavior of that nature. I have witnesses who can support this.

Paragraph 38

I did not rape J.O.

Paragraph 39

I have suffered severe emotional distress and anguish as a result of these false allegations.

Paragraph 43

Acadiana Center for Youth maintains strong safety procedures for youth residents, including medical care and regular monitoring. J.O. frequently displayed behavioral issues and was known to act out when denied what he wanted. One recurring issue involved smoking prohibited substances, which I refused to provide or tolerate.

Paragraph 46

I respectfully request dismissal of these claims against me.

I maintain that I am innocent of every allegation J.O. has made against me. The statements made by J.O. concerning both the facility and my conduct are false. I possess evidence and factual support demonstrating that the alleged incidents did not occur. I believe these accusations were made to gain release from juvenile custody, resulting in serious damage to my reputation, emotional well-being, and legal standing.

Keyana Nash